J.R. ALLISON, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–82–684.

Court of Criminal Appeals of Oklahoma.

Dec. 13, 1983.

As Amended Dec. 19, 1983.

Rehearing Denied Jan. 31, 1984.

---

**45.** *Hancock v. City of Muskogee,* 250 U.S. 454, 459, 39 S.Ct. 528, 530, 63 L.Ed. 1081, 1084 [1919].

D.C. Thomas, C. Merle Gile, Oklahoma City, for appellant.

Michael C. Turpen, Atty. Gen., John O. Walton, Asst. Atty. Gen., Oklahoma City, for appellee.

## OPINION

BUSSEY, Presiding Judge:

J.R. Allison, the appellant in this case, was employed as the Director of Food Services for Cameron University in Lawton, Oklahoma from 1970 until 1977. He was charged by information with four counts of embezzlement of Cameron University and Oklahoma state funds, services and goods, on September 23, 1980. The embezzlement allegedly occurred between 1971 and 1975.

Of the four counts, the appellant was convicted of two: count one (I), which

charged him with the embezzlement of the services of a Cameron University Food Services employee, in the amount of approximately $5,000; and count four (IV), embezzlement of Cameron University Food Services Catering Funds, in the approximate amount of $4,000. He was sentenced to a term of three years' imprisonment on count IV; three years' suspended sentence to run consecutive to the sentence imposed for count IV on count I; and was further ordered to pay $5,000 restitution to Cameron University on count I. He has perfected a timely appeal to this Court.

Due to the fact that the appellant was acquitted of the charges made in counts II and III, we shall not discuss the facts adduced at trial in support thereof, except as becomes necessary in disposition of the appellant's assignments of error.

In support of count I of the information, numerous witnesses who were employees of the Cameron University Food Services Department between 1971 and 1975, including the person whose services were embezzled, testified that the appellant, as Director of Food Services, was charged with overseeing the activities and labor of all food service employees; that in his position as Food Services Director, the appellant hired Aggie McIntosh as a food services employee under the title "salad cook"; that Ms. McIntosh clocked her daily time in and out at the cafeteria at Cameron in the Food Services Division; that Ms. McIntosh's check was drawn by the State of Oklahoma; and that Ms. McIntosh never performed work at the Cameron University Cafeteria, but instead spent all her time performing household work, laundry and other maid services two days per week for the appellant.[1]

Evidence adduced in support of count IV was that the appellant was instrumental in initiating and establishing a catering service at Cameron University; that from 1971 until 1973, he had sole control and responsibility for organizing, coordinating and collecting the proceeds from the catering functions; that he often told those to whom the Cameron Food Services had catered to pay him in cash or to make checks payable to him personally; that the appellant either received these payments personally, or had them mailed to a post office box to which he had the only key; that the catering service catered anywhere from two to four functions per week, nine months out of the year; that the appellant turned in very few invoices to the Cameron Food Services Department; that in April 1973 a bookkeeper/secretary became suspicious that the appellant was embezzling the catering money and so informed the Cameron University business manager, Mr. Ed Meese; that Mr. Meese contacted the appellant concerning the matter and arranged an appointment to discuss it with him; that the appellant ordered his bookkeeper/secretary to bring to his office all the copies of invoices, bills and papers concerning the catering services that she had; that the same bookkeeper/secretary saw the appellant leaving with a trash bag containing paper approximately thirty minutes after she had delivered the requested documents to him; that the appellant dumped a plastic trash bag containing the requested documents into his garbage can outside his home; that the bookkeeper/secretary who had become suspicious of the appellant retrieved the bag and its contents from the appellant's garbage can; that three bookkeepers/secretaries went through the invoices and totalled the amount of the invoices and the totalled amount was approximately $4,000; that these invoices were turned over to Mr. Meese; that Mr. Meese directed a bookkeeper/secretary to take the invoices to the cashier's office and match them with receipts for money paid to Cameron; that no such receipts could be found; that Dr. Don Owens, the President of Cameron University at that time was also made aware of the appellant's activities; that the appellant was required by Dr. Owens to begin making restitution to

---

**1.** According to the witnesses, Ms. McIntosh spent the other three days per week performing maid services for Dr. Don Owen, who was President of Cameron University at that time. Dr. Owen was not tried conjointly with the appellant.

the University; that changes were instituted in the handling of the catering funds, which removed them from the appellant's sole control; that Mr. Meese died in 1974; that, upon Mr. Meese's death, Dr. Owens inquired of the appellant as to whether the appellant felt he had sufficiently reimbursed the University, and upon the appellant's affirmative answer, gave the invoices described above to the appellant; that the appellant burned them in his fireplace; and that the appellant made no further restitution.

Although most of the invoices concerning the catering activities during the period from 1971 until 1973 were destroyed by the appellant, the State produced an invoice for catering functions by Cameron University, charged to "Ducks Unlimited," dated October 9, 1972. The invoice was written in the appellant's handwriting, and was for the amount of three-hundred twenty-one dollars ($321.00). The State also produced two checks drawn by Ducks Unlimited, dated October 11, 1972. One check was payable to the order of appellant in the amount of one-hundred twenty-one dollars ($121.00). It had been endorsed on the back by the appellant. The other check was drawn payable to the order of "Cameron College Food Services" in the amount of two-hundred dollars ($200.00). That check was endorsed in the appellant's handwriting. The bookkeeper charged with receiving deposit receipts for food services testified that neither of the checks was deposited.

The appellant's first allegation of error is that the trial court erroneously overruled his motion to quash the information. He alleges the information contained four separate, distinct and independent crimes; which were improperly joined.[2]

The appellant's argument is based upon 22 O.S.1981, § 404, which statute we have held to be repealed by implication by the enactment of 22 O.S.1981, §§ 436 and 440. *State v. Lowe,* 627 P.2d 442 (Okl.Cr.1981), and cases cited therein.

We are convinced the State was correct in joining all four counts against the appellant in the single information.

Title 22 O.S. § 436 expressly authorizes the joinder of counts against a defendant if the counts involve the same series of acts or transactions constituting an offense or offenses. Also, in a case similar to the present, this Court urged prosecutors to try as many embezzlement charges stemming from a single transaction or series of transactions as possible. See, *DeLaune v. State,* 569 P.2d 463 (Okl.Cr.1977).

In this case, it is apparent that much of the evidence presented in support of the different counts was to overlap. All four counts alleged occurred during the same period of time; were embezzled from the same institution; and involved the same entrustment. Nearly all the State's witnesses testified concerning each count of the information. A severance of the counts was not necessary in this case, and would have resulted in a considerable waste of judicial resources.

Since the appellant reurges the above argument in support of his eighth contention that the jury was improperly instructed; and presents no further argument or case authority, we deem our disposition of the first allegation dispositive of the eighth as well. There was no error.

The appellant maintains in his second assignment of error that the trial court erred in overruling his demurrer to the amended information. He argues that count I was demurrable because it failed to state the essential elements that the appellant's acts were committed while he was employed as the food services director of Cameron University; that he was entrusted with the labor of Aggie McIntosh due to his employment; and that due to this employment of trust, Ms. McIntosh's services were embezzled.

It is my view that, read as a whole, the information was sufficient.

2. The amended information is reproduced in Appendix A of this opinion.

Title 22 O.S.1981, § 409, ¶ 6 provides that an information is sufficient if it can be understood therefrom;

> [T]hat the act or omission charged as the offense is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended.

I also believe *Gibson v. State*, 328 P.2d 718 (Okl.Cr.1958), cited by the appellant and my colleagues, infra at p. ——, is not controlling. The defendant's conviction was reversed in *Gibson* because the *solitary* count in the information failed to allege his position of trust and employment. Thus, in *Gibson*, it was impossible to ascertain what was intended by the information. Such is not the present case.

Although I would affirm the judgment of guilt and the sentence imposed in count I, my colleagues' opinion, infra, requires that this count be REVERSED.

 The appellant's third allegation of error is that the prosecution of this case was barred by the statute of limitations.

The statute of limitations controlling in this case is set forth in 22 O.S.1981, § 152:

> Prosecutions for the crimes of bribery, embezzlement of public money, bonds, securities, assets or property of the state or any county, school district, municipality or other subdivision thereof, or of any misappropriation of public money, bonds securities, assets or property of the state or any county, school district, municipality or other subdivision thereof, falsification of public records of the state or any county, school district, municipality or other subdivision thereof, and conspiracy to defraud the State of Oklahoma or any county, school district, municipality or other subdivision thereof in any manner or for any purpose shall be commenced within seven (7) years after the discovery of the crime; provided, however, prosecutions for the crimes of embezzlement or misappropriation of public money, bonds, securities, assets or property of any school district, including those relating to student activity funds, or the crime of falsification of public records of any independent school district shall be commenced within five (5) years after the discovery of the crime.

> In all other cases a prosecution for a public offense must be commenced within three (3) years after its commission.

The appellant argues that the State failed to properly plead and prove that the money and services of which he was charged and convicted of embezzling were the property of the State of Oklahoma. According to the appellant's theory, this should have resulted in the application of the three-year time limitation upon prosecution, as opposed to the seven-year provision of the above statute, upon which the State relied. The appellant concludes that, under the terms of Section 152, the three year period began running at the commission of the crime, and had run prior to the filing of the information in this case.

The State expressly alleged in count I of the information that the services of Aggie McIntosh were State property. (See Appendix A, Count I) Furthermore, evidence produced at trial adequately supported the State's allegation. Ms. McIntosh testified at trial that she was hired by the Food Services Department of Cameron University; that she clocked in and out at the time clocks located in the Food Services Department of Cameron University; that she did not work in the Food Services Department there, but instead went to the appellant's home two days per week to perform housework, laundry, and other "maid" services; and that her paycheck was drawn by the State of Oklahoma. We are convinced that the seven-year statute of limitations provided by 22 O.S.1981, § 152, for the embezzlement of State property was applicable to count I.

 We also hold that the seven-year statute of limitations was applicable in count IV. Although the information is not worded as artfully as it might have been, it is clear that the appellant was charged with the embezzlement of State property in that count. Cameron University is a state

institution. See, 70 O.S.1981, §§ 3201, 3404, 3404.1. The employees of the Cameron Food Services Department were paid by checks drawn on the State of Oklahoma payroll. The proceeds of the catering fund were to be deposited with the Cameron business office, and ultimately with the State Treasurer.

To support his argument that the State nonetheless failed to prove that the catering funds the appellant embezzled were State property, the appellant directs our attention to two excerpts from the trial transcript. The first is the testimony of Mr. Jerrell Chesney, the executive officer for the Board of Regents for Oklahoma State University A & M colleges; who was called as a witness by the State. The second is that of Dr. Don Owen, the President of Cameron University at the time of the appellant's embezzlement (who was also charged in this matter); who testified for the appellant.

We have thoroughly reviewed the testimony of both men, and are convinced that the money embezzled from the catering fund indeed belonged to the State. The fact that the catering funds were not derived from tax or bond revenues, nor were they appropriated by the legislature does not mean that they were not State property. It is beyond question that taxes, bonds and appropriations are not the sole sources of revenue used in support of state institutions, such as colleges and universities. We conclude that the State adequately proved that the catering funds accumulated by, earmarked for and applied in support of the Food Services Division of Cameron University constituted state property.

The additional problem arises that even when we apply the seven-year statute of limitations to the charges made in count IV of the information, the prosecution on these charges was not commenced until a period of seven years and five months after discovery of the crime.[3]

Without more, it would appear that the statute of limitations had run on the prosecution of the appellant on count IV. However, when the appellant's employment with Cameron University terminated in December of 1977, he obtained employment and took up residence in New Mexico in early January of 1978. He was living there at the time of his trial.

Thus, when the appellant left Oklahoma in 1977, the statute of limitations was tolled. See, 22 O.S.1981, § 153.[4]

The appellant contends that Section 153 applies only to persons who are out of state at the time of the commission of an offense, and that it does not apply to one who was within the state at the time of the commission of an offense. He relies upon the construction of a similar statute by the Supreme Court of Montana. See, *State v. Clemens*, 40 Mont. 567, 107 P. 896 (1910).

This Court expressly disapproved of the Montana court's construction in that case in *Crain v. State*, 70 Okl.Cr. 45, 104 P.2d 450 (1940), wherein the construction of the statute given in *Coleman v. Territory*, 5 Okl. 201, 47 P. 1079 (1897) was reiterated:

The evident intention of this statute was that as to persons who, being without the territory, should, by means or agencies within the territory, commit any crime, the statute of limitations should not run until such person came within the territory. And as to all persons committing offenses, whether being at the time of the commission thereof within or without the territory, the statute of limitations should not run during the time when such offenders were not inhabitants of, or usually resident within, the territory; and if the defendant in this case was not, during the three years

3. The fact that the appellant was embezzling the catering funds entrusted to him was discovered in April of 1973. The information in this case was not filed until September of 1980.

4. Title 22 O.S.1981, § 153 provides:

If when the offense is committed the defendant be out of the state, the prosecution may be commenced within the term herein limited after his coming within the state, and no time during which the defendant is not an inhabitant of or usually resident within the state, is part of the limitation.

succeeding the offense·charged, an inhabitant of, or usually resident within, the territory, the statute did not run as to him. On the other hand, if during said time he was an inhabitant of, or usually resident within, the territory, the statute did run, and he could not now lawfully be convicted of the offense charged.

\* \* \* \* \* \*

Within the meaning of these authorities, the plaintiff in error must have had an actual fixed and permanent abode within the territory, or the statute of limitations did not run as to any offense committed by him. Independent of the authorities, the fair, reasonable construction of the statute itself would indicate that it was the intention of the legislature that the defendant should have had within the territory a fixed, permanent, and established home, where his personal presence might reasonably be known. The legislature, in the first part of the section, excepting from the operation of the statute of limitations, carefully provided that such limitation should not run as to one who was not within the jurisdiction of the territory, and, in the latter part of said section, excluded from its operation those who were not inhabitants or usually resident in the territory. *Crain,* supra, 104 P.2d at 453–54; *Coleman,* supra, 47 P. at 1080–81.

This construction and application of Section 153 is clearly applicable in the present case. The statute of limitations began to run in April of 1973 upon discovery of the embezzlement. The statute ran until December 1977 or January 1978, when it was tolled by the appellant's departure from State of Oklahoma and establishment of residence in New Mexico. The filing of the information in September 1980 was well within the time limits. See also, *Thompson v. State,* 96 Okl.Cr. 8, 247 P.2d 535 (1952).

The appellant's embezzlement of the services of Ms. McIntosh occurred over a three year period from 1972 until 1975. Although the embezzlement of her labor was known from the beginning, we find that the statute of limitations did not run on Count I for the reasons discussed above.

The appellant's special demurrer to the information based on the statute of limitations was properly overruled.

In the appellant's fourth assignment of error, he complains that approximately two-hundred fifty (250) exhibits were improperly introduced into evidence by the State, because they were not individually identified and authenticated.

All but three of the documents complained of were introduced in support of count II of the information, which alleged the appellant embezzled funds from a coffee fund. The appellant was acquitted on that count.

■ Only State's exhibits 250–252 are appropriate for our review. These exhibits consisted of copies of the "Ducks Unlimited" invoices and checks discussed above. The witness properly identified the invoices and the appellant's handwriting on them. Additionally, the appellant himself identified the invoices, checks and his handwriting thereon. There was no error.

The appellant's fifth assignment of error is that evidence of other crimes was impermissibly introduced into evidence.

The evidence of which the appellant complains consisted of the following testimony:

THE WITNESS:

A. I told her that there was a large amount of money being taken from the cafeteria that was not being deposited and that I had proof of it. Written proof.

MR. PERRINE:

Q. What was that proof that you gave that you told her about?

WITNESS:

A. I had kept a record for approximately five to six months of the amount of money coming in, coffee money each day. That had not been deposited. *I kept a record of two different times equipment had been sold.* The names, dates, check numbers and the amounts. And a list of

what the equipment was. I had stacked— (Tr. 434) (emphasis added)

■ Pursuant to the appellant's objection to the testimony concerning the sale of any equipment, the trial court instructed the jury that the appellant was not charged with any wrongdoing associated with the sale of any equipment, and that they were to draw no inferences therefrom. The trial court further asked the jurors to respond whether they could indeed disregard any reference to equipment sold. The entire panel answered in the affirmative. We are convinced that, if any error occurred, it was cured by the trial court's admonishment. See, *Willis v. State*, 650 P.2d 873 (Okl.Cr.1982).

■ The appellant's sixth assignment of error is that the trial court erred in failing to exclude the Comanche County District Attorney, Mr. Dick Tannery, from the courtroom upon the appellant's motion.

It was discovered during voir dire that one of the veniremen had an attorney-client relationship with Mr. Tannery five years prior to the appellant's trial. Upon discovery of this relationship, the Assistant District Attorney who tried the case, Mr. Robert Perrine, stated that Mr. Tannery would not be trying the case. The venireman was ultimately impaneled on the jury.

Subsequently, on the second day of trial, Mr. Tannery sat at the prosecution's table with Mr. Perrine. With the exception that he may have arranged a few exhibits at the prosecution's table, Mr. Tannery did not participate in the appellant's trial. Nonetheless, the appellant complains that Mr. Perrine misled him concerning this matter. He further alleges that, had he known Mr. Tannery would be present at trial, he would have removed the juror from the venire panel.

We do not agree that Mr. Perrine either deliberately or inadvertently misled the appellant concerning Mr. Tannery's participation at trial. Mr. Tannery did not participate in the trial, and we fail to see that his mere presence at the prosecution's table prejudiced the appellant. See generally, *Bias v. State*, 561 P.2d 523 (Okl.Cr.1977). Moreover, the case authority cited by the appellant is totally inapplicable to the case at hand. (See, *Williams v. State*, 658 P.2d 499 (Okl.Cr.1983)). This assignment of error is without merit.

The appellant's seventh and eighth assignments of error concern matters related to his defense to count IV of the information.

According to the appellant, Mr. Meese and he had reached an agreement prior to April 1973 wherein the appellant was to receive ten percent of the receipts of the catering services as compensation for the appellant's overtime work caused by the catering service. Dr. Owen was informed of this arrangement at a meeting held between himself, the appellant and Mr. Meese. Dr. Owen ordered the appellant to reimburse the University for the money taken, because it was contrary to University policy.

The appellant's motion in limine to exclude any statements made by Mr. Meese from the prosecution's case was sustained, because Mr. Meese was dead, and his statements would constitute inadmissible hearsay. At the close of the State's case in chief, the State made a similar motion in limine, which was also sustained.

■ The appellant now argues that the statements Mr. Meese made during the meeting with the appellant and Dr. Owen should have been admitted into evidence under 12 O.S.1981, § 2804(B)(3), because Mr. Meese's statements were made against his own pecuniary or proprietary interests.

We need only note that although the trial court refused to let either the appellant or Dr. Owen testify concerning the content of the conversation, the information was subsequently brought out through examination of another witness by the appellant. Thus, the jury was informed of the agreement the appellant alleged to have existed between himself and the deceased, Mr. Meese. This assignment of error is without merit.

The appellant further argues in his ninth allegation of error that the trial court erroneously refused to instruct the jury concerning the alleged agreement. The appellant contends that the following instruction should have been given:

If you find and believe from the evidence in this case that the Defendant was acting as an agent, servant, employee of Cameron University and while acting as said agent, servant, employee did any acts charged in Count One through Four at the direction of his supervisor or supervisors without intent to embezzle funds, then you must find the Defendant not guilty on said count or counts.

In support of his contention, the appellant cites two cases which contain general language to the effect that when an agent, servant or bailee does with property only what he is authorized to do by the terms of his employment and has no felonious intent, he is not guilty of embezzlement. See, *Wyatt v. State*, 21 Okl.Cr. 121, 205 P. 194 (1922); *Logan v. State*, 493 P.2d 842 (Okl.Cr.1972).

 We are convinced that the instruction on intent given by the trial court adequately addressed the appellant's defense.[5] It is well settled that instructions to be given the jury are within the discretion of the trial court. His judgment shall not be disturbed as long as the instructions, taken as a whole, fairly and accurately stated the applicable law. See, *Green v. State*, 611 P.2d 262 (Okl.Cr.1980).

The appellant's tenth assignment of error is in the form of a motion for new trial, in which he alleges he was deprived of his right to trial by an impartial jury as guaranteed by Okla. Const. Art. II, § 20. The appellant complains that during voir dire examination, he was not informed that a venireman and ultimate juror, Mr. Gregory Hamilton, was the son-in-law of a person who had been employed by the Comanche County District Attorney's office the summer prior to the appellant's trial.

This cause was remanded for an evidentiary hearing on the matter on the 25th day of March, 1983, by this Court. The following information was adduced at that hearing:

1) The juror's mother-in-law, Ms. Alberta Allen, a/k/a Pat Allen, was employed by the Comanche County District Attorney's office from July 13, 1981 until August 21, 1981. Ms. Allen performed legal research for the District Attorney, but had no knowledge of this case at that time. The juror had knowledge of Ms. Allen's employment at the Comanche County District Attorney's office, but had no knowledge of the capacity in which she was employed. Ms. Allen's employment terminated so she could attend law school at the University of Oklahoma in Norman.

2) Ms. Allen again obtained employment with the Comanche County District Attorney's office in May of 1982, subsequent to the date of the appellant's trial. No written application for employment was filed by Ms. Allen, and she could not recall whether she had made oral application for the position prior or subsequent to the appellant's trial. The juror had no knowledge that Ms. Allen was to be employed by the Comanche County District Attorney's office in the summer of 1982, at the time of the appellant's trial.

3) Numerous telephone calls were made between the juror's home and Ms. Allen's apartment in Norman throughout the period during which the appellant's trial was held.[6] Ms. Allen, the juror and the juror's

---

5. The instruction given by the trial court was:

In a prosecution for the offenses charged in the Information in this case, the felonious intent on the part of the defendant to commit a crime as alleged in the Information is an essential ingredient of the crime charged and a material fact which must be proved to your satisfaction by legal and competent evidence beyond a reasonable doubt before you can convict the de-

fendant. Such intent, however, is a question of fact to be determined by the jury from all the facts and circumstances in evidence before you.

6. The juror's telephone bills revealed that telephone calls were made from his home to Ms. Allen's apartment on March 17, March 19, and March 23. Ms. Allen's telephone bills revealed that telephone calls were made from his apartment to the juror's home on March 15, twice on

wife all testified that the juror had little, if any, conversation with Ms. Allen; that they did not at any time discuss the matter of the juror's jury duty; and that the calls were made between Ms. Allen and her daughter (the juror's wife) for unrelated reasons. It was further testified that it was not uncommon for Ms. Allen and her daughter to converse by telephone several times per week.

4) The juror testified that the fact that his mother-in-law had previously been employed by the Comanche County District Attorney's office had no bearing whatsoever on his decision in the appellant's case. (Transcript Ev. Hearing p. 23).

The appellant maintains that the relationship between the juror and Ms. Allen should have been brought to light by the juror in response to questions propounded the venire panel by either himself or the trial court.[7] He further argues that the juror's failure to disclose that information prevented him from challenging the juror for implied bias pursuant to 22 O.S.1981, § 660, or, in the alternative, from exercis-

ing a peremptory challenge pursuant to 22 O.S.1981, § 654 to remove the juror.

We addressed a similar issue in *Manuel v. State*, 541 P.2d 233 (Okl.Cr.1975). In that case, the defendant learned that one of the jury members was the husband of the District Attorney's secretary after the jury had begun deliberations in the case. We noted in *Manuel* that the record supported no implication that the juror was biased, hence no actual prejudice was demonstrated by the defendant. Nonetheless, we found that the fact that the juror was married to the District Attorney's secretary "... approached being a basis for challenge for cause." We therefore felt constrained to reverse that case and remand it for a new trial.[8,9]

The present case differs from *Manuel* and *Thompson* (supra, footnote 8). Under the circumstances peculiar to this case, we believe that, had the juror's relationship to Ms. Allen, and Ms. Allen's relationship to the Comanche County District Attorney's office been known, no basis for a challenge for cause under 22 O.S.1981, § 660, or prior case law, would have been present. Fur-

---

March 20, and on March 27. The appellant's trial was held on March 18, 19, 22, 23 and 24.

7. · The questions asked were;
 *THE COURT:*
 I will ask you certain questions now concerning your qualifications to sit as a juror and then I'm sure the counsel will want to ask you matters that I didn't cover and—and maybe want to go into more detail. I will ask first if any of you know the attorneys in this case. They are Mr. Thomas, Mr. Gile or Mr. Elliott, their other partner. Mr. Perrine is the Assistant District Attorney. He works for Mr. Tannery, the District Attorney, and they have several other assistant and staff personnel. Any of you acquainted with any of those people?
 *JURORS:*
 (No response) (Tr. 8).
 \* \* \* \* \* \*
 *MR. THOMAS:*
 O.K. Have any of you ladies and gentlemen had the opportunity to have any personal, listen to me closely, any personal contact. O.K.? Personal contact with any of the persons in the District Attorney's office here in Lawton? Mr. Perrine or Mr. Tannery or any—anyone who works there, ever had the occasion to come into personal contact? I

don't mean it socially, but I mean go to their office for some reason or whatever? O.K. Are any of you close friends of anyone employed by the District Attorney's office here in Comanche County? O.K. (Tr. 62).
The juror stated at the evidentiary hearing that he did not volunteer any information because he did not know any persons "presently" employed by the Comanche County District Attorney's office; and that he did not interpret the questions asked the jury panel as referring to *past* employees.

8. Our decision to reverse the conviction in *Manuel* was also influenced by the fact that the prosecutor, and perhaps even the trial court, had knowledge of the employment relationship between the juror's wife and the District Attorney. In addition, certain remarks made by the prosecutor served in part as a basis for reversal by two of the three members of this Court. Neither of those circumstances existed in the present case.

9. See also, *Thompson v. State*, 519 P.2d 538 (Okl.Cr.1974), wherein we held in part that a juror who was the brother of a deputy sheriff serving as a witness in chief for the State was subject to challenge for cause because of his close relationship with the deputy sheriff.

thermore, we do not find that the juror's situation "approached being a basis for challenge for cause" under *Manuel.*

■ The circumstances in the present case reflect a far more attenuated relationship between the prosecution and the juror than that which existed in either *Manuel* or *Thompson.* Ms. Allen had terminated her employment with the District Attorney's office at least seven months prior to the appellant's trial. She had gained no knowledge of the appellant's case by virtue of her employment. No communication was had between the juror and Ms. Allen concerning the appellant's trial during the time the juror sat on the appellant's jury. The juror was not aware of Ms. Allen's pending re-employment (if, indeed it was pending at that time) with the District Attorney's office.

Thus, the issue is reduced to the following: in light of the fact that the trial court would not have been required, under the circumstances of this case, to dismiss Mr. Hamilton for cause; nor did Mr. Hamilton's situation "approach being a basis for cause" *Manuel,* supra; and in the absence of any demonstration of prejudice otherwise resulting, is the assertion by the appellant that he would have exercised a peremptory challenge to remove the juror, had he known before trial what he now knows, sufficient cause to mandate reversal of this case?

We think not.

■ We realize that the established rule is that all doubts regarding juror impartiality must be resolved in favor of the accused. *Manuel,* supra; *Scrivener v. State,* 63 Okl.Cr. 418, 75 P.2d 1154 (1938). However, in this case there is no doubt. The juror stated at the evidentiary hearing that his mother-in-law's brief period of employment with the District Attorney seven months prior to the appellant's trial did not affect him as a juror. Review of the transcript of the voir dire reveals that the appellant's attorney extensively examined the juror concerning his ability to sit as an impartial juror. (See Appendix B). There

is no evidence in the record which would lead us to believe that the appellant was prejudiced by the fact that Mr. Hamilton sat on his jury. See generally, *Jones v. State,* 555 P.2d 63 (Okl.Cr.1976).

The appellant's Motion for New Trial Upon Newly Discovered Evidence is overruled.

The judgment and sentence in count I is REVERSED, and the judgment and sentence in count IV is AFFIRMED.

CORNISH and BRETT, JJ., specially concur.

## APPENDIX A

The amended information alleged that between the years 1971–1975, the appellant did:

### COUNT I

commit the crime of Embezzlement in the manner and form as follows: that said J.R. ALLISON did wilfully, fraudulently and feloniously over a period of time as above stated, while entrusted with the use of labor of Cameron University Food Service employees [sic], Aggie McIntosh, did breach that trust and misappropriate the labor of said employees for the purpose of use as a maid in a certain house located at 508 SW 26th Street in Lawton, Comanche County, Oklahoma, while said employee was being paid by Cameron University and the State of Oklahoma, by and through the Board of Regents for Higher Education, said value of labor being approximate amount of $5,000.00 said labor for the use and benefit of J.R. ALLISON, in violation of 21 OS 1451.

### COUNT II

commit the crime of Embezzlement in the manner and form as follows: that said J.R. ALLISON did wilfully, fraudulently and feloniously over a period of time as above stated, while employed as the Food Service Manager of Cameron University was entrusted with monies by the Food Service employees at Cameron University as petty cash for the coffee fund and did misappropriate said petty

cash for his own use and benefit said petty cash being approximate amount of $5,000.00 in violation of 21 OS 1451.

COUNT III

commit the crime of Embezzlement in the manner and form as follows: that said J.R. ALLISON did wilfully, fraudulently and feloniously over a period of time as above stated, while employed as the Food Service Manager of Cameron University misappropriate food, entrusted to him as the Food Service Manager of Cameron University, for his personal use at poker parties held at the residence of Don J. Owen located in Comanche County, Oklahoma, said food being approximate value of $10,800.00. in violation of 21 OS 1451.

COUNT IV

commit the crime of Embezzlement in the manner and form as follows: that said J.R. ALLISON did wilfully, fraudulently and feloniously over a period of time as above stated, while employed as the Food Service Manager of Cameron University was entrusted with monies by the Food Service employees at Cameron University which came from the catering fund and did misappropriate said catering fund for his own use and benefit, said catering fund being approximate amount of $4,000.00 in violation of 21 OS 1451.

## APPENDIX B

MR. THOMAS:

Mr. Hamilton, directing my question to you, at this time as we sit here in this courtroom do you think that J.R. Allison is probably innocent?

MR. HAMILTON: I presume him to be innocent. I have not heard any evidence.

MR. THOMAS: Why do you presume him to be innocent, Mr. Hamilton?

MR. HAMILTON: Well, my understanding of the law is that a person is presumed to be innocent until proven guilty.

MR. THOMAS: Mm hmm. That's the law. You're right about that. And you have heard no evidence, have you?

MR. HAMILTON: No, sir.

MR. THOMAS: Not a word.

MR. HAMILTON: No.

MR. THOMAS: All right. Let me ask you this candid question. At this moment—well, do you think that—do you feel like well, I presume J.R. Allison innocent, but he must have done something wrong or he wouldn't be in this courtroom? Do you feel that way?

MR. HAMILTON: I feel it's an allegation or I've heard some allegations brought against him. And I—I guess he's here because of those allegations.

MR. THOMAS: You're absolutely right again. do you know who prepared and filed the allegations?

MR. HAMILTON: No, sir.

MR. THOMAS: The allegations are contained on a piece of paper—may I see the Information, Your Honor? Thank you. That is called an Information. So is that because it informs you? I guess that is why they call it that. You can see the word. Complaint and Information. And the way J.R. Allison ended up on this courtroom was that a piece of paper with that written on it was filed. You understand that?

MR. HAMILTON: Yes, sir.

MR. THOMAS: By the District Attorney.

MR. HAMILTON: (Nodded his head in an affirmative manner.)

MR. THOMAS: Now, do you understand and it's so critical, do you understand that the filing of that piece of paper by the District Attorney against J.R. Allison is to not be taken by you or any other person on this jury as any evidence of any kind of wrong doing by Mr. Allison? Do you understand that?

MR. HAMILTON: Yes, sir.

MR. THOMAS: It's just a piece of paper.

MR. HAMILTON: Yes, sir.

MR. THOMAS: O.K. But it is a piece of paper, isn't it? And we're on trial today. Who, Mr. Hamilton, is going to have to put on some evidence? Does Mr. Allison have to put on some evidence to prove he didn't do it?

MR. HAMILTON: No.

MR. THOMAS: He doesn't have to?

MR. HAMILTON: I believe that the—it's the State's job to prove that he did commit what the State said he did.

MR. THOMAS: Absolutely right. You gave me the right answer a minute ago, and almost talked you out of it. I said you mean he doesn't have to put on any evidence, and you hesitated a minute. Do you understand that the law of the United States and the law of the State of Oklahoma says that J.R. Allison or you or—or anyone does not have to present one witness, one piece of evidence in a criminal case. Did you know that—that is the law?

MR. HAMILTON: Yes.

MR. THOMAS: Doesn't have to open his mouth, did you know that?

MR. HAMILTON: Yes.

MR. THOMAS: Doesn't have to take that witness stand. Did you know that?

MR. HAMILTON: (Nodded his head in an affirmative manner.)

MR. THOMAS: The reason being is and you answered is because he's presumed innocent right now. And it's Mr. Perrine's job and Mr. Perrine is a—is a good lawyer. It's his job to present the evidence to you.

MR. HAMILTON: (Nodded his head in an affirmative manner.)

MR. THOMAS: Now, we have this problem. You have already stated that you right now presume Mr. Allison and you're talking under oath and I believe you and I accept what you say is true. Presume him to be innocent right now. And you understand that he doesn't have to get on that witness stand, he doesn't have to say a word, doesn't have to call any witnesses. How much evidence—how much proof if you know, needs to be presented to you before under the law you can vote guilty?

MR. HAMILTON: Beyond a reasonable doubt.

MR. THOMAS: Are you sure your mother-in-law and you haven't discussed the law?

MR. HAMILTON: No, sir. I sat on a case Monday.

MR. THOMAS: Well, you—O.K. That's right. beyond a reasonable doubt. Now, that has been the law in the United States since 1776. Presumed innocent till proven guilty beyond a reasonable doubt. Do you think it's good law?

MR. HAMILTON: Yes, sir. (Tr. 65–68)

CORNISH, Judge, specially concurring:

While I concur in the affirmance of the judgment and sentence in Count IV, I am authorized to announce that Judge Brett concurs with me in reversing Count I for the following reasons:

> It is clear that to bring one within its provisions [the statute defining embezzlement] certain essential allegations must be made. First, that the accused occupies an official position or is an agent of the association. *Second, that he must have received or have in his possession or control by virtue of a trust relation property of the association.* Third, while holding said property in a trust relationship, he must appropriate it to his own use or purpose and thereby betray his trust. ... The information must plead facts showing a fiduciary relationship creating the trust and the breach thereof. (Emphasis in the original.)

*Gibson v. State*, 328 P.2d 718, 721–22 (Okl.Cr.1958).

Count I of the Information herein falls short in these essentials. It provides simply:

> [t]hat at and within said County and State, between the years of 1971–1975 J.R. ALLISON then and there being, did then and there, wilfully, unlawfully, wrongfully, and feloniously

COUNT I

commit the crime of Embezzlement in the manner and form as follows: that said J.R. Allison did wilfully, fraudulently and feloniously over a period of time as above stated, while entrusted with the use of labor of Cameron University Food Service employees Aggie McIntosh, did breach that trust and misappropriate the

labor of said employees for the purpose of use as a maid in a certain house located at 508 SW 26th Street in Lawton, Comanche County, Oklahoma, while said employees was being paid by Cameron University and the State of Oklahoma, by and through the Board of Regents for Higher Education, said value of labor being approximate amount of $5,000.00 said labor for the use and benefit of J.R. ALLISON, in violation of 21 OS 1451

The Information is deficient of facts showing the accused is an official or agent of the university. I do not agree that this essential element can be garnered from the allegations of the other counts within the Information. This Court has not addressed this specific issue previously. But, it is a well established fact that to be sufficient, a criminal information must allege every element of the offense charged. *E.g., In re D.S.H.*, 549 P.2d 826 (Okl.Cr. 1976). While 22 O.S.1981, § 409 provides that more than one offense may be charged in one information, there is no authority to bolster one count by the allegations contained in another count within the same information. Those courts which have addressed this specific issue have disallowed such interpretation unless there has been incorporation by specific reference to the allegations of another count. See 41 AM. JUR.2d *Indictments and Informations*, § 221 (1968) wherein it is noted:

Each count is, in legal contemplation, a separate indictment and must contain all the averments necessary to constitute the offense sought to be charged in such court, for it is upon the principle of joinder of offenses that the joinder of counts is permitted.

In the determination of the sufficiency of an indictment, each count must be treated as a whole, and the jury is not required to treat such an accusation as one indivisible unit. (Footnotes omitted.)

The author has reviewed the cases cited in support of this passage, and has found they establish the rule described. In *People v. Moore*, 200 Colo. 481, 615 P.2d 726 (1980), the Colorado Supreme Court cited this portion of American Jurisprudence in support of their holding that each count of an Information must be complete of itself and independent of the other counts. See also *Martinez v. People*, 163 Colo. 503, 431 P.2d 765 (1967); *Turner v. State*, 242 Md. 408, 219 A.2d 39 (1966); and, *State v. Sutton*, 14 N.C.App. 422, 188 S.E.2d 596 (1972).

We would therefore hold that the demurrer to Count I should have been sustained.