2011 OK CR 3

**Wendell Arden GRISSOM, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

**No. D–2008–595.**

Court of Criminal Appeals of Oklahoma.

April 1, 2011.

John W. Coyle III, John W. Coyle IV, attorneys for defendant at trial.

Barry Retherford, Mike Fields, Asst. District Attorneys Watonga, OK, attorneys for the State at trial.

Michael D. Morehead, Kathleen M. Smith, Okla. Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General, Jennifer L. Strickland, Asst. Attorney General, Oklahoma City, OK, attorneys for Appellee on appeal.

### OPINION

LEWIS, Judge.

¶ 1 Wendell Arden Grissom, Appellant, was tried by jury and found guilty of Count 1, murder in the first degree, in violation of 21 O.S.Rev.Supp.2005, § 701.7(A); Count 2, shooting with intent to kill, in violation of 21 O.S.Rev.Supp.2005, § 652(A); Count 3, grand

larceny, in violation of 21 O.S.2001, § 1705; and Count 4, possession of a firearm after former conviction of a felony, in violation of 21 O.S.Rev.Supp.2005, § 1283, in Blaine County District Court, Case No. CF–2005–80.[1] The State alleged that the murder involved three statutory aggravating circumstances: The defendant knowingly created a great risk of death to more than one person; the murder was committed by a person serving a sentence of imprisonment on conviction of a felony; and the existence of a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2001, § 701.12(2), (6), and (7). The jury found all three aggravating circumstances and sentenced Appellant to death for murder in the first degree, life imprisonment for shooting with intent to kill, twenty-five (25) years imprisonment for grand larceny, and forty (40) years imprisonment for possession of a firearm after former conviction of a felony. The Honorable Ronald G. Franklin, District Judge, presided over the trial and pronounced the judgment and sentence on June 17, 2008. This Court stayed execution of the judgment and sentence on July 1, 2008. Mr. Grissom appeals.

### FACTS

¶ 2 On November 2, 2005, Appellant left Arkansas and headed west on Interstate 40, driving his white Chevrolet truck. Just across the Oklahoma state line, he picked up a homeless hitchhiker, Jessie Johns. As they continued west, the two men drank whiskey and got acquainted. They also discussed plans to commit some robberies or burglaries to raise money. Later that evening, Appellant checked into a hotel in Oklahoma City, paying $266.00 for a weekly rental. Appellant shared his room that evening with Jessie Johns, who slept on the floor.

¶ 3 The following morning, Jessie Johns watched as Appellant showed him how to load a .44 caliber black powder pistol, one of two firearms in Appellant's possession at the time. The other was a two-shot .22 caliber derringer. The two men drank more alcohol

---

1. The State alleged, and the jury found, that Counts 2 through 4 were committed after former conviction of two (2) or more felonies, namely prior burglaries committed by the Appellant.

that morning as they again headed west in Appellant's truck on Interstate 40. They stopped around 10:45 a.m. at the Love's Country Store on Exit 108, where security cameras recorded each man buying a pair of brown cotton gloves. They then drove into rural Blaine County, looking for a house to burglarize.

¶ 4 Appellant ultimately parked his truck in the driveway of the residence of Matt and Dreu Kopf, near Hitchcock, in rural Blaine County. He told Jessie Johns to wait until the shooting was over and then come in and help him burglarize the house. Appellant approached a sliding door at the rear of the residence and knocked. Dreu Kopf was inside her home that morning with her best friend, Amber Matthews, and her two young children, eighteen month-old Rylie and infant Gracie Jo. Rylie was in her crib in the bedroom and Ms. Kopf was holding Gracie. Ms. Matthews answered the sliding glass door as Ms. Kopf turned in her glider chair to speak with Appellant. He asked Ms. Kopf if her husband was home. She replied that her husband was at work. Appellant told her he would come back later. Ms. Matthews closed the door, but seconds later Appellant reappeared. Ms. Kopf handed the baby to Ms. Matthews and approached the door again. Appellant shot a pistol round into the large glass pane and shattered it. He then stepped into the residence and fired a second shot at Ms. Kopf, striking her in the hand.

¶ 5 Amber Matthews ran with the baby into Rylie's bedroom. Ms. Kopf fought with the intruder and pushed him across the room onto a couch. While Ms. Kopf was on top of Appellant fighting him, she begged him to take what he wanted and leave. He just laughed at her as he pulled the black powder pistol from his waist and put it to her head. She grabbed at the weapon as he fired it, but a bullet tore through her hand and struck the side of her head, fracturing her skull. Appellant then stuck the big pistol in her hip and fired again. The force of this shot threw Ms. Kopf onto the floor.

¶ 6 Appellant got up and headed toward the bedroom where the children and Ms. Matthews were. Ms. Kopf then heard Ms. Matthews beg for her life, and the report from Appellant's pistol. Ms. Kopf escaped from the house to her garage and activated the overhead door. Realizing that she was leaving a blood trail for her killer to follow, she knew she could not hide. She saw the white truck in her driveway pointed toward the road for a getaway, and ran toward it.

¶ 7 Jessie Johns had left the truck and approached the residence after hearing several shots. He saw Ms. Kopf run from the house. He stepped through the shattered door and found Appellant standing over a wounded Amber Matthews. He watched as Appellant fired another shot into Ms. Matthews with the .44. Johns then told Appellant that someone had run from the house. Appellant ran toward the truck, tried to get inside, and fired his .44 pistol again at Ms. Kopf as she pulled away. Not far from her house, Dreu Kopf flagged down a trio of truckers hauling rock and told them that her friend and children were dead and she had been shot. One of the truck drivers, himself a retired police officer, got into the truck with Ms. Kopf. He reported the shooting by phone to the Kingfisher County Sheriff's Office and drove Ms. Kopf to the hospital in nearby Watonga.

¶ 8 Realizing their plans were foiled, Appellant and Johns attempted their escape from the crime scene on a red four-wheeler ATV they found in the Kopf's garage. A postal delivery man saw two men on the red four-wheeler leaving the Kopf residence with a black dog chasing them. The rock haulers, who had encountered Dreu Kopf only a few minutes earlier, saw two men speed past them on a red four-wheeler. The men on the four-wheeler ran out of gas after a short distance, but managed to hitch a ride with a passing farmer, who assumed they were laborers. He gave them a ride to the Hillstop Cafe, just over the Kingfisher County line on Highway 33.

¶ 9 The two women who were running the Hillstop Cafe that day became frightened when they noticed a pair of men looking in the windows of the store from outside and looking inside cars parked at the Hillstop. The two men then came in the store. Each bought an individual can of beer. One of the

men, later identified as Jessie Johns, walked across the highway, ducked into some trees, and sat there drinking his beer. The other man headed across a wheat field on foot. Johns later walked back across the street and purchased a second can of beer. After he left the store the second time, one of the clerks called the Kingfisher County Sheriff's Office and reported two suspicious men hanging around the store. The clerks also asked the only customer in the store, a local man waiting on his lunch, to stay with them until the two strangers were gone.

¶ 10 Recognizing the possible connection to the report of a shooting at the nearby Kopf residence about thirty minutes earlier, Kingfisher County Sheriffs officers now raced toward the Hillstop Cafe. Not far away, emergency personnel and various officers of the Watonga Police Department, the Blaine County 4/11/2011 Sheriffs Office, and the Oklahoma Highway Patrol descended on the Kopf residence after the initial report of a shooting. Officers approached the home cautiously, but managed to enter and find the Kopf children alive. Amber Matthews was unconscious and mortally wounded. She died during a medical evacuation flight to an Oklahoma City hospital.

¶ 11 Back at the Hillstop Cafe, a Kingfisher County deputy sheriff approached Jessie Johns, who was now walking down the road, and detained him for investigation. The deputy questioned Johns briefly, searched him for weapons, and drove him back to the Hillstop Cafe. Meanwhile, law enforcement officers continued to gather information about the crimes at the Kopf residence and the suspicious persons reported at the Hillstop. About forty-five minutes after being detained, police arrested Jessie Johns for involvement in the four-wheeler theft and other crimes at the Kopf residence.

¶ 12 Investigators eventually located Appellant hiding in a rock pile near the Hillstop Cafe. They recovered a blood-stained .22 pistol and a pair of brown cotton gloves from his person. They ultimately recovered Appellant's .44 pistol and a second pair of brown cotton gloves discarded near the crime scene. The State also presented evidence that a DNA profile isolated from blood stains on Appellant's jeans matched to a DNA profile from the known blood of Dreu Kopf. Appellant did not testify at trial, but the State presented a videotape of his statement to police. On appeal, Appellant describes these crimes as "a tragedy with no discernible cause," admitting that he shot Amber Matthews and Dreu Kopf "for reasons even he does not understand." We will relate additional facts in connection with the individual propositions of error.

## ANALYSIS

¶ 13 In connection with this appeal, Appellant timely filed a *Motion for New Trial Based on Newly Discovered Evidence of Juror Misconduct.* Rule 2.1(A)(3), Rules of the Court of Criminal Appeals, 22 O.S.Supp.2010, Ch. 18, App. We directed the State of Oklahoma to respond to the motion, and subsequently remanded the issues presented in those pleadings to the district court for evidentiary hearing to permit the development of a complete record. The evidence received in that hearing is now before us and is hereby incorporated as part of the original record on appeal. Rule 3.11(A), 22 O.S.Supp. 2010, Ch. 18, App.

¶ 14 In Appellant's *Motion for New Trial Based on Newly Discovered Evidence of Juror Misconduct,* he argues reversible error occurred when a prospective juror, later selected to serve on the jury, failed to disclose during voir dire examination that he was previously arrested and charged with two crimes. The record establishes that the juror was arrested in 1989 and charged with larceny of merchandise from a retailer, a felony. He entered a plea of guilty to the offense and received a deferral of sentence for one (1) year. After completion of a term of probation, the charge was dismissed. The prospective juror was arrested a second time in 2007 and charged with three misdemeanors, including possession of marijuana, possession of drug paraphernalia, and failure to maintain security verification form. Those charges were subsequently dismissed on the State's motion. Appellant also presented testimony from his trial counsel that if he had known of the prospective juror's prior arrests and charges, he would have inquired

further to determine the prospective juror's qualifications.

¶ 15 During the district court's *voir dire* examination,[2] the court directly asked each panel of prospective jurors if they had ever been "charged with or accused of a crime?" Several jurors responded affirmatively and gave accounts of their arrests and/or convictions of various crimes. The prospective juror with whom we are concerned here did not respond affirmatively to this question. He also demurred when the court asked if he had any answers he felt the court or attorneys "need to hear." The prosecutor later asked, "is there anyone that had indicated previously that they had a prior contact with law enforcement that I have not spoken with?" Again, the juror did not reveal his prior arrests or charges. When the prosecutor asked prospective jurors if they had "any contact with the District Attorney's office," the juror responded: "I know you from high school so that's another thing. I was going to mention that earlier." The prosecutor acknowledged that he and the prospective juror "played a little football together." The prospective juror then denied there was "anything about the fact that you have known me that would cause you not to be fair and impartial in this case?" The record also reflects that the prosecutor in this case did not represent the State in either of the criminal cases filed against the prospective juror. The parties passed this prospective juror for cause and he served on the trial jury. In an affidavit and his subsequent testimony at the evidentiary hearing, the juror explained that he believed he did not have to disclose his prior arrests because the charges in both cases were dismissed. He conceded at the evidentiary hearing that his failure to answer these questions affirmatively was not entirely truthful. The juror also denied having any bias for or against the parties, stating that he served as a juror only reluctantly because he felt it was his duty.

¶ 16 In *Perez Enriquez v. State,* 1987 OK CR 164, 740 P.2d 1204, and earlier cases, this Court has held that "[d]epriving defense

counsel of information that could lead to the intelligent exercise of a peremptory challenge is a denial of an appellant's right to a fair and impartial jury." *Id.,* 1987 OK CR 164, ¶ 7, 740 P.2d at 1206. In *Perez Enriquez,* a juror informed the trial court *during the trial* when she realized a primary defense witness—appellant's sister had—defrauded her and become pregnant while having an affair with the juror's ex-husband. The juror explained that she had previously known the witness by another name. Despite this revelation, the trial court instructed the jury and submitted the case for a decision, resulting in the appellant's conviction. Only after the verdict did the court interview the juror concerning her knowledge of the defense witness. The juror then told the court that her prior involvement with the witness made it impossible to believe her alibi testimony at trial, but that her verdict would have been the same. *Id.,* 1987 OK CR 164, ¶¶ 4–6, 740 P.2d at 1205. This Court concluded that the facts showed "the juror was highly prejudiced towards the witness," *id.,* 1987 OK CR 164, ¶ 5, 740 P.2d at 1205–6; and that the appellant was clearly harmed by the nondisclosure, because "his defense stood or fell with the credibility of his sister's testimony." *Id.,* 1987 OK CR 164, ¶ 8, 740 P.2d at 1206.

> One biased or prejudiced juror is enough to require remand to assure the appellant receives a fair trial. While we applaud the courage and candor [the juror] displayed by informing the trial court of her previous experience with the witness, such belated information does not cure her failure to timely reveal her bias and prejudice so that defense counsel could either challenge her for cause or intelligently exercise his last remaining peremptory challenge.

*Id.* (internal citations omitted).

¶ 17 *Perez Enriquez* cited earlier opinions in *Bass v. State,* 1987 OK CR 29, 733 P.2d 1340, and *Tibbetts v. State,* 1985 OK CR 43, 698 P.2d 942. In Bass, after the jury was selected and sworn, a juror revealed that the State's eyewitness to the crime was his sister's fiance. The juror apparently had not

---

**2.** The district court also used questionnaires to collect information from prospective jurors. The questionnaire only asked if prospective jurors

had ever been convicted of a felony. The juror in question truthfully answered "no."

heard the witness's name when it was read aloud during voir dire. Counsel moved for a mistrial, which was denied. Relying on *Tibbetts*, the appellant argued the juror's nondisclosure "deprived him [of] the right to intelligently exercise his peremptory challenges to the venireman, and thus denied him a fair trial." *Bass*, 1987 OK CR 29, ¶¶ 2–3, 733 P.2d at 1341. The evidence against the appellant was circumstantial, and the eyewitness's testimony "provided the greatest detail in the discription [sic] of the robber and the getaway car." *Bass*, 1987 OK CR 29, ¶ 6, 733 P.2d at 1342. The Court in Bass held that:

> since defense counsel was not informed of the [juror's] relationship after he had manifested his interest therein by specific interrogatories incorporated into a more general examination ... he was effectively deprived of an opportunity to fully explore this area as a potential foundation for a challenge for cause. Additionally, the defendant was at the very least deprived of knowledge upon which he could intelligently exercise a peremptory challenge, for *we do not doubt that any defense attorney would so challenge a prospective juror with such a kinship to an employee of his adversary when, as here, circumstances otherwise permit.*

1987 OK CR 29, ¶ 6, 733 P.2d at 1341–42, quoting *Manuel v. State*, 1975 OK CR 174, 541 P.2d 233, 237 (emphasis added).

¶ 18 In *Tibbetts*, a prosecution for kidnapping and sexual assault, the prospective jurors were repeatedly asked if any member of their family had been the victim of similar crimes. They were also asked about relationships to any of the witnesses, parties, attorneys, or family members involved in the case; and if there was any reason they could not sit as fair and impartial jurors. *Id.*, 1985 OK CR 43, ¶¶ 1, 6, 698 P.2d at 944. In the face of these questions, a prospective juror failed to disclose that her son-in-law was a Sheriffs deputy in the same county as the trial; that he was seeking employment with the District Attorney's office; and that her daughter had recently been a victim of a sex crime. The deputy sheriff was also in and

out of the courtroom during the trial. *Id.*, 1985 OK CR 43, ¶ 4, 698 P.2d at 944.

¶ 19 This Court again reversed the conviction and remanded for a new trial, finding it "apparent that she was not an impartial juror despite her saying she could be one;" and that although "[s]he would not be exempt from jury duty due to her relationship with the deputy ... that information should have been made known to all parties." *Id.*, 1985 OK CR 43, ¶ 4, 698 P.2d at 945–46. The Court reasoned that trial counsel during *voir dire* had made clear "the type of relationship he was looking for," and that the appellant was "effectively denied the opportunity to gain knowledge to base a potential challenge for cause, or, at least, a preemptory challenge." *Id.*, 1985 OK CR 43, ¶ 8, 698 P.2d at 946. The Court again quoted its statement from Manuel that "we do not doubt that any defense attorney would so challenge a prospective juror with such a kinship to an employee of his adversary, when, as here, circumstances otherwise permit." *Id.*, quoting *Manuel v. State*, 1975 OK CR 174, ¶ 7, 541 P.2d at 237.

¶ 20 In *Allison v. State*, 1983 OK CR 169, 675 P.2d 142, the appellant sought reversal of his conviction because a trial juror failed to disclose during *voir dire* that his mother-in-law had been employed by the District Attorney's office a year before the trial. This Court remanded the matter for an evidentiary hearing. The facts developed at the hearing showed that the juror's mother-in-law had been employed as a legal researcher and had resigned her position seven months before appellant's trial to attend law school. While an employee of the District Attorney, she had no contact with appellant's case. She never spoke with the juror about the trial of appellant's case, although she was aware of his service as a trial juror. Finally, the juror himself testified that his mother-in-law's previous employment with the District Attorney's office had no bearing on his decision in the case. *Id.*, 1983 OK CR 169, ¶¶ 52–55, 675 P.2d at 151–52.

¶ 21 On these facts, the Court in *Allison* asked whether "in the absence of any demonstration of prejudice ... is the assertion by the appellant that he would have exercised a

peremptory challenge to remove the juror, had he known before trial what he now knows, sufficient cause to mandate reversal of this case?" *Id.*, 1983 OK CR 169, ¶ 60, 675 P.2d at 153. The Court answered this question in the negative, finding "no evidence in the record which would lead us to believe that the appellant was prejudiced by the fact that [the juror] sat on his jury." *Id.*, 1983 OK CR 169, ¶ 62, 675 P.2d at 153. The Court distinguished the *Manuel* case, where it had concluded that a prospective juror's failure to disclose his marriage to the District Attorney's chief secretary warranted reversal. The Court reasoned that the employment of a juror's mother-in-law as a legal researcher for the District Attorney did not "approach being a challenge for a cause;" and was "a far more attenuated relationship between the prosecution and the juror" than the undisclosed relationship in *Manuel. Allison*, 1983 OK CR 169, ¶¶ 59–60, 675 P.2d at 153.

¶ 22 In *Manuel*, the appellant was convicted of murder and sentenced to life imprisonment. During *voir dire* examination, counsel repeatedly inquired about prospective jurors' relationships with law enforcement agencies and the District Attorney's office. Counsel did not learn until the second day of trial that one of the jurors was married to the chief secretary employed by the District Attorney. Counsel objected to the verdict and moved for a new trial, which was denied. *Id.*, 1975 OK CR 174, ¶¶ 1, 4, 541 P.2d at 235. This Court reversed, finding:

> [t]he venireman's marriage to an employee of the District Attorney's Office was certainly known to himself, and in all probability known to the prosecutor or his assistant and perhaps the trial court in such a rurally populated area ... In view thereof, we are of the opinion that the nonfeasance of at least the veniremen and most probably the prosecution in failing to inform the defense counsel of the situation was not commensurate with principles of fundamental fairness. We recognize that in other voir dire examination Mr. Cunningham indicated that he was of the opinion that he

could sit as a fair and impartial juror, and that the record before us does not establish that he failed to do so ... However, since defense counsel was not informed of the relationship after he had manifested his interest therein by specific interrogatories incorporated into a more general examination at a time when the veniremen and most probably the prosecution were knowledgeable thereof, he was effectively deprived of an opportunity to fully explore this area as a potential foundation for a challenge for cause. Additionally, the defendant was at the very least deprived of knowledge upon which he could intelligently exercise a peremptory challenge, for we do not doubt that any defense attorney would so challenge a prospective juror with such a kinship to an employee of his adversary when, as here, circumstances otherwise permit.

*Id.*, 1975 OK CR 174, ¶¶ 5–7, 541 P.2d at 236–37.

¶ 23 Although defense counsel in this case had not "manifested his interest" in the topic of prospective jurors' prior arrests with specific questions on that subject during his *voir dire* examination, *see Manuel*, 1975 OK CR 174, ¶¶ 5–7, 541 P.2d at 236, counsel was entitled to rely on the candor of jurors when they gave responses to questions posed by the court and the prosecutor.[3] We find in this case that "the general parameters of the *voir dire* examination should have elicited a response" from the prospective juror, disclosing that he had prior arrests and charges. *Id.*

¶ 24 However, the relevant facts of *Perez Enriquez, Bass, Tibbetts, and Manuel* are distinguishable from the situation that confronts us today. Unlike the facts revealed about the jurors in those cases, the undisclosed information shown here does not support a challenge for cause or show any improper relationship that would "approach a challenge for cause." *Allison*, 1983 OK CR 169, ¶ 59, 675 P.2d at 153. And we cannot say, as the Court did in those cases, that

---

**3.** This case illustrates how counsel must exercise "greater care in examining prospective jurors" about contacts with law enforcement where the inquiry concerns prior arrests or charges that did not result in convictions. *Tibbetts*, 1985 OK CR 43, ¶ 8, 698 P.2d at 945.

"any defense attorney" would peremptorily challenge a prospective juror based solely on knowledge of their prior arrests. Indeed, two other prospective jurors in this case who disclosed their prior arrests—one for disorderly conduct and another for cruelty to animals—were passed for cause and served on the jury. A third prospective juror disclosed that he was on a deferred sentence for a felony. He was also passed for cause, but was not drawn to serve on the final panel. The record contradicts any suggestion that a prospective juror's prior arrest would have led inexorably to a peremptory challenge from the defense.[4]

¶ 25 This Court said in *Manuel* that "it is not error alone that reverses judgments of convictions of crime in this State, but error plus injury, and the burden is upon the appellant to establish to the appellate court the fact that he was prejudiced in his substantial rights by the commission of error." *Id.*, 1975 OK CR 174, ¶¶ 5–7, 541 P.2d at 236, quoting *Thompson v. State*, 1974 OK CR 15, ¶ 10, 519 P.2d 538, 541. The Court's opinion in *Allison* shows that an appellant must do more than simply assert that he would have used a peremptory challenge if he had known *then* what he knows now. Appellant does not even make that claim here. Trial counsel's testimony at the evidentiary hearing shows that he might have inquired further into the details of the arrests, and would have weighed the prospective juror's prior arrests as a factor in exercising his peremptory challenges.[5] Trial counsel also testified at the evidentiary hearing that if he had known of the prospective juror's failure to disclose the prior arrests, he would have challenged the juror for cause. However, even if counsel had discovered during *voir dire* the juror's honest, but mistaken, belief about his obligation to disclose his prior arrests, the juror's error would not have supported a challenge for cause. 22 O.S.2001, §§ 659, 660 (challenge for cause must show either im-

plied bias defined by statute, or express bias, i.e., a state of mind showing that prospective juror cannot try the case impartially).

¶ 26 Appellant's claim falls short of demonstrating any actual injury from the juror's non-disclosure. The juror was previously arrested and charged with crimes on two occasions: this is the sum of his nondisclosure. The charges arising from those arrests were dismissed. The juror testified at the evidentiary hearing that he honestly believed (incorrectly, it turns out) that he was not required to disclose his prior arrests. He had no knowledge of the facts of the case; no undisclosed relationship to the material witnesses or the parties. The juror testified on *voir dire* that he had gone to high school and played football with the lead prosecutor in this case, and knew one of the witnesses casually, which apparently raised no concerns for the defense about his impartiality.

¶ 27 At the evidentiary hearing, the juror testified that he was working as a partially commissioned salesperson at the time of the trial, had two children, and his wife was eight and a half months pregnant. He testified that he was reluctant but willing to do his duty as a juror and did not try to excuse himself from jury duty because of his job or family circumstances. He denied having any intention to mislead the court or counsel. These circumstances dispel the inference, so imaginatively urged by Appellant, that this juror corruptly concealed the truth about his arrests to get himself seated on this jury. While we do not condone the juror's non-disclosure, we find that Appellant suffered no prejudice from it. No relief is warranted under the controlling authorities. Appellant's *Motion For A New Trial Based On Newly Discovered Evidence of Juror Misconduct is denied.*

¶ 28 In Proposition One, Appellant argues the district court committed reversible error by failing to instruct the jury on

---

4. Notwithstanding, trial counsel testified at the evidentiary hearing that in a case such as this, he did not want people with criminal arrests or convictions sitting on the jury, because in his experience people who had lived a moral life were more likely to give a life sentence.

5. Despite his testimony at the evidentiary hearing that prior arrests and criminal charges were paramount among his concerns for prospective jurors in this case, the State points out that defense counsel did not ask a single question of a prospective juror concerning a prior arrest or criminal charge.

the lesser-included offenses of second degree murder and first degree heat of passion or misdemeanor manslaughter and other lesser offenses applicable to the non-capital charges. Appellant has waived review of these alleged errors by failing to request instructions on lesser-included offenses and failing to object to the instructions given by the district court at trial. We review these claims for plain error only, which this Court has defined as error "going to the foundation of the case or taking from the defendant a right essential to his defense." *Simpson v. State*, 1994 OK CR 40, ¶ 12, 876 P.2d 690, 695.

¶ 29 Appellant bases his argument for these lesser-included offense instructions on his alleged intoxication at the time of the crimes. He points to his recorded statements that he and co-defendant Jessie Johns had consumed whiskey on the previous day while driving into Oklahoma City. He also told police that on the morning of the crimes, he drank three beers, took a prescription anti-depressant, and drank a half-pint bottle of vodka. He argues that his consumption of intoxicants created *a prima facie* case of voluntary intoxication, which could have negated the respective elements of specific intent required to convict him of malice aforethought murder, first degree felony murder in the commission of first degree burglary, shooting with intent to kill, and grand larceny. He concludes that if the jury had been required to determine whether he lacked the requisite intent to commit these crimes as a result of voluntary intoxication and given applicable lesser-included offense instructions, he would have been found guilty of manslaughter or, at most, second degree murder. In a related argument, Proposition Two claims that the court's incomplete instructions to the jury on the defense of voluntary intoxication caused reversible error in both the capital and non-capital charges.

¶ 30 Counsel for Appellant manages to avoid any mention of a fact that this Court finds significant to the issue before us: Appellant effectively conceded his guilt to all of these charges at trial. In the beginning of defense *voir dire*, and with Appellant's express consent,[6] defense counsel stated to prospective jurors:

I have been trying to think about how to say this and I really don't know any other way to say it than to say it. The evidence is going to show that on November 3, 2005 about 12:30 in the afternoon that Wendell Grissom shot and murdered a beautiful 23 year old girl in cold blood. So now I said it. Now you know it. It will show that he also shot another young girl who was there with her children. She struggled for her life and got away ... The evidence will show that Wendell Grissom was the man who pulled the trigger.

¶ 31 During his *voir dire* examination, trial counsel described Appellant's crime as "a cold-blooded, calculated, premeditated act of murder." He told prospective jurors:

I'm going to make sure you understand that there is no question that ... he is guilty of premeditated first degree murder;

\* \* \*

It will be a clear cut case of murder in the first degree, I can assure you of that;

\* \* \*

[I]t will be proven that he will be guilty of murder in the first degree and in a premeditated manner took the life of a 23 year old girl who had nothing to do with it. There is no reason for it;"

\* \* \*

And I will tell you because we want to get people on the jury who are able to give

---

6. The trial transcript reflects the following:
 DEFENSE COUNSEL: And then the only other thing we have is that we wanted to make clear for the record that the strategy that we have employed in this trial, essentially taking responsibility for what happened on November 3, 2005, that we have completely discussed that with Mr. Grissom, of course we have discussed that with him, and he is in agree-

ment with that and he will state that to the Court. I think that's important.
 THE COURT: Mr. Grissom, is that correct?
 THE DEFENDANT: Yes, sir.
 THE COURT: Are you fully aware of the tactics that have been taken?
 THE DEFENDANT: Yes, sir.
 THE COURT: And you approve of that?
 THE DEFENDANT: Yes, sir.

real meaningful consideration to all of the possible penalties in the case ... the evidence that the prosecutors introduce will show you that he murdered a beautiful 23 year old girl and he shot another beautiful girl, neither of which had any involvement in it, they didn't cause, they didn't have anything to do with it. That is what the evidence will show in this case. So that's where we are going to come to in this case, is that if you are selected to sit on this jury ... you are going to have to decide whether that young man lives or dies. Because that's what the evidence is going to show.

\* \* \*

[W]e will present evidence on behalf of Mr. Grissom evidence about his life and evidence about what happened in his life that brought him to that magic day. Things like his incredible drinking problem, very drunk at the time it happened. Those are some things. *They are not legal defenses to murder. They are in mitigation to whether or not, as to the penalty he should receive.* (emphasis added).

¶ 32 In opening statements to the jury, trial counsel continued this strategy by conceding that "there are no excuses for what Wendell Arden Grissom did that day." Counsel told the jury the facts of Appellant's life, the facts of the crimes as Appellant had admitted them, and described him as a man "whose alcoholism has spiraled out of control, and [who] has done nothing but drink since 2002." Counsel emphasized Appellant's desire to accept responsibility, saying, "Wendell has never once ran, for one second ran from this crime ... He has always stood up and said I did it and I'm here to face it." Trial counsel concluded his opening statement by saying:

> And when this is all said and done I'm going to ask you to find my client guilty, guilty of felony murder. And after that we'll go on to another stage. And from there you will see who Wendell Grissom is and you'll decide what the appropriate punishment should be ... Wendell Grissom is not going to sit up here and say that Jessie Johns made him do this or that he did this because Satan took him over or

overtook him. He is a truly remorseful man for what occurred.

¶ 33 Defense counsel modified his strategy only slightly in his first stage closing argument, again emphasizing Appellant's "acceptance of responsibility," but referencing his consumption of alcohol and suggesting that jurors could find Appellant did not act with malice aforethought. Counsel told jurors:

> He drank a fifth of alcohol the night before and began drinking the first thing the next morning. Words. I want a cigarette is all he says about fifty times. He goes into this lunatic type rant about his ex-wife over and over again, about the problems she has caused him. His demeanor. Look at the video. And his motive. His motive. He admits to the crime. Wendell Grissom is not a calculated killer. He is a lost soul whose life spiraled out of control. I take nothing away from his actions, but ask you to look at everything that happened that day and led up to these events. It's of a lost man whose alcoholism and depression spiraled into a recipe for destruction.

¶ 34 Defense counsel at no point contested Appellant's guilt of first degree murder or the non-capital charges. The record is replete with counsel's statements that Appellant was admitting he committed first degree murder and the other crimes alleged, and was simply seeking to persuade the jury to spare his life due to his remorse and other mitigation evidence. The Supreme Court aptly described the point of such a strategy in *Florida v. Nixon,* 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004):

> [Counsel] may reasonably decide to focus on the trial's penalty phase, at which time counsel's mission is to persuade the trier that his client's life should be spared. Unable to negotiate a guilty plea in exchange for a life sentence, defense counsel must strive at the guilt phase to avoid a counterproductive course ... [by] attempting to impress the jury with his candor and his unwillingness to engage in "a useless charade."

*Id.,* 543 U.S. at 192, 125 S.Ct. at 563, quoting *United States v. Cronic,* 466 U.S. 648, 654, n. 9, 104 S.Ct. 2039, 2044, n. 9, 80 L.Ed.2d 657, n. 9 (1984). The Tenth Circuit Court of

Appeals has also recognized the viability of this strategy in circumstances where evidence of guilt is overwhelming. In *Charm v. Mullin,* 37 Fed.Appx. 475 (10th Cir.2002)(unpublished), the court rejected a capital prisoner's argument that this strategy resulted in ineffective assistance of counsel, describing a situation remarkably similar to the case before us:

> [D]efense counsel was faced with overwhelming evidence establishing [the prisoner's] guilt, including foremost [his] own videotaped confession describing in detail his participation in these horrific crimes ... And defense counsel did pursue pretrial motions on [the prisoner's] behalf, cross-examined the State's witnesses, made evidentiary objections at trial and asserted in [the prisoner's] defense the minimal evidence available indicating that [he] might have been intoxicated at the time of the crimes ... Trial counsel's apparent strategy was to maintain credibility with the jury during the first stage so that he could strongly pursue a sentence less than death during the penalty phase. And counsel did fully assert a case in mitigation during the trial's capital-sentencing stage.

*Id.,* 37 Fed.Appx. at 480 (internal citations omitted); *see also, Turrentine v. Mullin,* 390 F.3d 1181, 1208 (10th Cir.2004)(finding trial counsel faced with overwhelming evidence of guilt could reasonably concede guilt of two counts of premeditated murder to persuasively argue remaining counts and retain credibility for sentencing phase).

¶ 35 This Court follows the "well established rule that when a defendant, who has a right of election as to several defenses, takes the stand as a witness and makes such admissions as to render every theory of defense unavailable save one, he will be deemed to have elected that one." *Williamson v. State,* 1991 OK CR 63, ¶ 55, 812 P.2d 384, 399; *Sayers v. State,* 10 Okl.Cr. 233, 246, 135 P. 1073, 1077 (1913). Such cases usually involve defendants who give testimony of a specific defense at trial and then, on appeal, claim entitlement to instructions on some

other theory of defense or a lesser-included offense.[7] We now expressly hold that the same rule applies to a defendant who offers his defense through statements of his counsel rather than his own testimony. Specifically, where the defendant makes admissions by counsel during trial that render every defense unavailable save one, he is deemed to have elected that defense; and may, by his election, foreclose the submission of instructions on other theories of defense or lesser-included offenses inconsistent with his defense. *Bennett,* 1987 OK CR 208, ¶ 13, 743 P.2d at 1098 (holding that where there is no evidence to support lesser included offense, the court has no right to ask the jury to consider the issue); *Ybarra v. State,* 1987 OK CR 31, ¶ 16, 733 P.2d 1342, 1345 (finding appellant was not entitled to instructions of self defense or manslaughter which were inconsistent with his theory of defense).

¶ 36 The question before us is simply whether the trial court committed plain error in its failure to instruct the jury on lesser-included offenses to the capital and non-capital charges. We find that Appellant's admission of guilt to the charges, through numerous statements of his counsel during trial, constituted a valid strategic election to present only a sentencing stage defense. By electing a sentencing stage defense, Appellant foreclosed his claim to first-stage jury instructions on lesser-included offenses. The district court's failure to instruct the jury on lesser-included offenses did not "go to the foundation of the case" or take from the Appellant any "right essential to his defense," and thus was not plain error. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695. Proposition One is denied.

¶ 37 In Proposition Two, Appellant argues the trial court committed reversible error in giving incomplete instructions on voluntary intoxication. The district court, without a request from the defense or an objection from the State, gave the following instructions on the defense of voluntary in-

---

7. E.g., *Mitchell v. State,* 1994 OK CR 70, ¶ 36, 884 P.2d 1186, 1200–01; *Bennett v. State,* 1987 OK CR 208, ¶ 12, 743 P.2d 1096, 1098; *Spuehler v. State,* 1985 OK CR 132, ¶ 9, 709 P.2d 202, 204; *Collums v. State,* 1985 OK CR 20, ¶¶ 19–21, 695 P.2d 872, 876; *Seegars v. State,* 1982 OK CR 202, ¶¶ 3–4, 655 P.2d 563, 565; *Jones v. State,* 1976 OK CR 261, ¶ 34, 555 P.2d 1061, 1069–70.

toxication to the jury in the first stage of trial:

> Evidence has been introduced of intoxication of the defendant as a defense to the charge that the defendant has committed the crime of First Degree Murder.[8]

> The crime of **Murder in the First Degree** has as an element the specific criminal intent of **Malice Aforethought.** A person is entitled to the defense of voluntary intoxication if that person was incapable of forming the specific criminal intent because of **his** intoxication.[9]

> Definitions: Drugs–Substances intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in a human or other animal; substances other than food intended to affect the structure or any function of the body of a human or other animal; under the law, the substance **Cymbalta is a drug.**[10]

The district court did not give applicable instructions on the burden of proof for a defense of voluntary intoxication,[11] or various definitions related to this defense.[12] As discussed in Proposition One, the district court did not give instructions on any lesser-included offenses related to the specific intent crimes charged in the information. Appellant waived these alleged errors by failing to object to the instructions on these grounds and request lesser-included offense instructions at trial. We review these claims only for plain error. *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

■ ¶ 38 The Oklahoma Statutes provide generally that "[n]o act committed by a person while in a state of voluntary intoxi-

cation shall be deemed less criminal by reason of his having been in such condition." 21 O.S.2001, § 153. The statutes further provide that "[h]omicide committed with a design to effect death is not the less murder because the perpetrator was in a state of anger or voluntary intoxication at the time." 21 O.S.2001, § 704. Our case law has long recognized an exception to these rules where intoxication utterly negates the *mens rea* necessary for the crime. This Court has described the narrow parameters of the voluntary intoxication defense:

> A defense of voluntary intoxication requires that a defendant, first, be intoxicated and, second, be *so utterly intoxicated, that his mental powers are overcome, rendering it impossible for a defendant to form the specific criminal intent ... element of the crime.*

*McElmurry v. State*, 2002 OK CR 40, ¶ 72, 60 P.3d 4, 23, quoting *Jackson v. State*, 1998 OK CR 39, ¶ 67, 964 P.2d 875, 892 (emphasis added). We agree with Appellant that upon a proper showing of a prima facie case, voluntary intoxication may provide a partial defense to the specific intent crimes charged here. *Malone v. State*, 2007 OK CR 34, ¶ 22, 168 P.3d 185, 196 (murder); *Grayson v. State*, 1984 OK CR 87, ¶ 5, 687 P.2d 747, 748–49, n. 1 (shooting with intent to kill); *Huffman v. State*, 24 Okl.Cr. 292, 298–299, 217 P. 1070, 1072–73 (1923) (grand larceny). We also agree with Appellant that when the district court instructs on voluntary intoxication as a defense to first degree murder, the court must give a corresponding instruction on the lesser-included offenses of second degree murder or first degree manslaughter.

---

8. Instruction No. 8–35, OUJI–CR(2d).

9. Instruction No. 8–36, OUJI–CR(2d).

10. Instruction No. 8–39, OUJI–CR(2d).

11. Instruction No. 8–38, OUJI–CR(2d) provides:
It is the burden of the State to prove beyond a reasonable doubt that the defendant formed the specific criminal intent of the crime ... If you find that the State has failed to sustain that burden, by reason of the intoxication of [Name of Defendant], then [Name of Defendant] must be found not guilty ... You may find [Name of Defendant] guilty of [Lesser Included Offense], if the State has proved beyond a reasonable

doubt each element of the crime of [Lesser Included Offense].

12. The trial court omitted a definition of the phrase "incapable of forming specific criminal intent," which the uniform instructions define as "the state in which one's mental powers have been overcome through intoxication, rendering it impossible to form a criminal intent." Instruction No. 8–39, OUJI–CR(2d). The court also failed to give the uniform definition of the term "intoxication" which is "[a] state in which a person is so far under the influence of an intoxicating liquor/drug/substance to such an extent that his/her (passions are visibly excited)/(judgment is impaired). *Id.*

*Williams v. State,* 1973 OK CR 354, ¶ 21, 513 P.2d 335, 339; *Oxendine v. State,* 1958 OK CR 104, ¶ 10, 335 P.2d 940, 944; *Miller v. State,* 9 Okl.Cr. 55, 57–58, 130 P. 813, 814 (1913).[13] However, these premises cannot obtain relief for the Appellant here.

¶ 39 In *Frederick v. State,* 2001 OK CR 34, ¶ 130, 37 P.3d 908, 942, this Court said:

> *Mere consumption of alcohol and marijuana is not sufficient to raise the voluntary intoxication defense without a showing that it prevented defendant from forming a premeditated intent.* Appellant, after committing the murder, was able to drive over 300 miles in the victim's pickup to Dumas, Texas, and register at a motel using another alias, where he listed Beck's pickup on the registration slip. In his statement to Officer Bell, he was able to give a detailed description of how "Jeff" had dumped Beck's body, after he had killed him, in an open field in Spencer, Oklahoma, uncovered, and unburied. Jeff was the name he was using in Oklahoma the week of the murder. The accuracy of his description was confirmed when Beck's body was found. Frederick never claimed in his statement to Officer Bell that he had been intoxicated when he killed Beck, and in fact he was able to describe the events clearly (emphasis added).

Based upon its examination of the facts, the Court in *Frederick* concluded:

> [a]s there was insufficient evidence of intoxication presented at trial from which a rational jury could find that the defendant was "so utterly intoxicated" that his mental powers were totally overcome, rendering it impossible for him to form the specific intent to kill, *an instruction on voluntary intoxication was not warranted, and it would have been error to instruct the jury on that defense.*

*Id.,* 2001 OK CR 34, ¶ 131, 37 P.3d at 942 (emphasis added).

13. The Court in *Miller* quoted *Wharton on Homicide* 809 (3d Ed.), where it is said:

> Homicide committed when the accused was so intoxicated that no intent to commit the crime of murder could have existed, however, not being murder in the first degree, is either manslaughter or murder in the second degree. In-

¶ 40 In *Taylor v. State,* 2000 OK CR 6, 998 P.2d 1225, the trial court in a capital murder prosecution instructed the jury on voluntary intoxication but failed to give an instruction on the lesser-included offense of first degree manslaughter. *Id.,* 2000 OK CR 6, ¶ 17, 998 P.2d at 1230. This Court declined to reverse the murder conviction, finding that Appellant was "able to give a detailed account of the events of the night in question," and had not shown his entitlement to the voluntary intoxication instruction. *Id.,* 2000 OK CR 6, ¶ 20, 998 P.2d at 1230. The Court held:

> an instruction on voluntary intoxication was not warranted by the evidence and *it was error for the trial court to so instruct* . . . [Appellant] was not entitled to an instruction on first degree manslaughter. This proposition is therefore denied.

*Id.,* 2000 OK CR 6, ¶ 20, 998 P.2d at 1230–31 (emphasis added).

¶ 41 In *Charm v. State,* 1996 OK CR 40, 924 P.2d 754, the capital murder defendant claimed the trial court erred when it gave instructions on the defense of voluntary intoxication but refused to give defendant's requested lesser-included offense instructions on second degree murder or first degree manslaughter. *Id.,* 1996 OK CR 40, ¶ 5, 924 P.2d at 759. The defendant argued that because of the trial court's error, "the jury's only options were convicting or acquitting him of first degree murder." *Id.,* 1996 OK CR 40, ¶ 6, 924 P.2d at 759. This Court affirmed the murder conviction, again finding the evidence of voluntary intoxication was insufficient to warrant an instruction in the first place. The Court also held:

> [Appellant] cannot use the fact that this unjustifiable instruction was given to support his current claim that the evidence warranted lesser offense instructions on second degree murder and first degree manslaughter.

toxication cannot operate as an entire exemption from criminal responsibility, and it is not conclusive against the existence of criminal intent. At the utmost it only extenuates the crime from murder to manslaughter, and it does not do this as a matter of law.

9 Okl.Cr. at 57–58, 130 P. at 814.

*Id,* 1996 OK CR 40, ¶ 13, 924 P.2d at 761 (emphasis added).

¶ 42 In *Malone v. State,* 2007 OK CR 34, 168 P.3d 185, this Court found that evidence of a capital murder defendant's methamphetamine intoxication was sufficient to create a prima facie case and warranted instructions on voluntary intoxication and manslaughter. *Id.,* 2007 OK CR 34, ¶ 22, 168 P.3d at 196. The trial court gave those instructions, but they contained several errors, most importantly failing to inform the jury "what specific mental state was at issue, [by] referring to the general phrase 'specific criminal intent,'" rather than the malice aforethought necessary for a murder conviction. *Id.,* 2007 OK CR 34, ¶ 31, 168 P.3d at 199.

¶ 43 While the Court found a "significant error" in the jury instructions on voluntary intoxication in *Malone,* it ultimately concluded the error was harmless, because the jury was well aware that the defendant's only defense was lack of specific intent to kill due to intoxication; and there was "no reasonable possibility that Malone's jury would have agreed with and accepted his voluntary intoxication defense, regardless of how thoroughly the jury was instructed upon it" *Id.,* 2007 OK CR 34, ¶¶ 28, 37, 168 P.3d at 198, 201.

> [N]o reasonable juror who heard all the evidence in the first stage of his trial could possibly have concluded that [defendant] was unable to form "malice aforethought" at the time of the shooting or that he did not deliberately intend to kill ... The evidence ... was overwhelming and clearly established that [defendant] knew what he was doing and deliberately chose to shoot and kill [the victim].

*Id.,* 2007 OK CR 34, ¶ 38, 168 P.3d at 201–202.

¶ 44 From these authorities we conclude that no relief is warranted for the apparent errors in the trial court's instructions on voluntary intoxication. While the evidence established Appellant's consumption of alcohol and prescription medication, it did not create a *prima facie* case that Appellant was so intoxicated that he could not form the specific intent to commit these crimes. Appellant loaded his pistols and left Oklahoma City that morning driving west. He and his accomplice bought gloves at a convenience store shortly before the crimes. He targeted an isolated rural residence for a home invasion burglary because he needed money. He parked his truck in the driveway of the home pointed toward the road for a quick getaway, telling his accomplice to follow him when the shooting stopped. He engaged his unsuspecting victims in a pretextual conversation, giving them a false name and a phony cover story, then stormed the home with gunfire. He attempted to murder the homeowner, and surely believing he had succeeded, he executed her friend with two shots to the head from his .44. He fled on a stolen four wheeler when the surviving victim took his waiting truck and made her escape. He bought and paid for a beer at a country cafe within an hour of the shootings. Appellant later surrendered and cooperated with authorities in locating the murder weapon where he had discarded it shortly after his crimes.

¶ 45 Appellant gave a detailed confession within hours after the shootings. He was able to recount the details of his recent activities and his life history leading up to the crimes. He also effectively admitted his guilt of murder at trial, hoping to avoid the extreme punishment. Under these circumstances, we find the trial court abused its discretion in even administering a voluntary intoxication instruction; and Appellant cannot use the fact that this unjustifiable instruction was given to obtain reversal. *Malone,* 2007 OK CR 34, ¶ 39, 168 P.3d at 202 (defendant's admission that he was solely responsible for the victim's death, and the two close-range shots fired into the victim's head, "leave no reasonable doubt" about his intent to kill); *Charm,* 1996 OK CR 40, ¶ 13, 924 P.2d at 761. The instructions on voluntary intoxication were not plain error. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695. Proposition Two requires no relief.

¶ 46 In Proposition Three, Appellant claims the trial court erred by allowing the jury to sentence Appellant for the non-capital charges, enhanced by his prior felony convictions, during deliberations in the first stage of trial. 22 O.S.2001, § 860.1. He cites the need for "breathing space" between the jury's deliberations on his non-capital

crimes, which were charged "after former conviction," and the charge of first degree murder. Appellant cites our holding in *Chapple v. State*, 1993 OK CR 38, 866 P.2d 1213, where the Court established the following procedure for trials involving allegations of prior felony convictions to enhance punishment:

> Whenever a defendant is charged with multiple counts, one or more which require a prior conviction as an element of the crime, and one or more which do not, trial shall be bifurcated. Those crimes which do not contain an element of former conviction shall be tried to guilt or innocence in the first stage. Those crimes which contain the element of prior conviction shall be tried to guilt or innocence in the second stage.

*Id.*, 1993 OK CR 38, ¶ 18, 866 P.2d at 1217. Appellant now argues that this Court must reverse all four counts because "there is no indication that Mr. Grissom personally waived his mandatory right to have his trial bifurcated regarding the enhanced non-capital counts ... so as not to expose his jury to the fact that he had been previously convicted of two or more felonies." [14] Appellant made no objection to the procedure followed in the trial court regarding sentencing on the enhanced non-capital charges in the first-stage deliberations. He has therefore waived all but plain error. *Simpson*, 1994 OK CR 40, 876 P.2d at 695.

¶ 47 We begin with the observation that the bifurcation procedure promulgated in *Chapple* is intended to shield a criminal defendant "from prejudicial misuse of his former convictions by the jury during their determination of guilt" in a criminal trial. *Chapple*, 1993 OK CR 38, ¶ 18, 866 P.2d at 1217. The "prejudicial misuse" contemplated in *Chapple* occurs when the fact of a prior conviction is unfairly brought to bear on the question of Appellant's guilt of the current charges. Appellant's argument again ignores the fact that he admitted both his prior convictions and his guilt of the current charges during the first stage of trial. Because appellate counsel sees "nothing to be gained for Mr. Grissom in having the jury aware of these prior felonies" while deliberating his guilt on the charge of first degree murder, he argues that the failure to bifurcate the proceedings was reversible error.

¶ 48 Despite appellate counsel's disagreement with trial counsel's strategy, Appellant's admission of his prior convictions was entirely consistent with maintaining credibility in the first stage of trial and dedicating the best efforts of the defense to avoiding capital punishment. The strategy of concluding the sentencing on non-capital charges in the first stage of trial permitted counsel to focus the jury's attention solely on the issue of capital punishment in the second stage, consistent with the overall defense strategy. Since the Court's decision in *Chapple*, we have reaffirmed the principle that a defendant who admits the fact of his prior convictions during testimony in the first stage of trial effectively waives the protections of a two-stage proceeding. *Dodd v. State*, 1999 OK CR 20, ¶ 4, 982 P.2d 1086, 1087, n. 4; *see also, Ray v. State*, 1990 OK CR 15, ¶ 7, 788 P.2d 1384, 1386; *Wilmeth v.*

---

14. The trial transcript contains the following exchange between the Court and Mr. Grissom:

THE COURT: Mr. Grissom, Mr. Coyle has indicated to me that you did not want to testify in this stage of the trial. Do you understand that you have an absolute right to testify if you so desire, but you also have an absolute right not to testify. Do you understand that?
THE DEFENDANT: Yes, sir.
THE COURT: Do you wish to testify in the first stage of this trial?
THE DEFENDANT: No, sir.
THE COURT: Also your attorney Mr. Coyle has indicated that he he wishes to—that you wish to stipulate or agree that you have been convicted of the offenses alleged in the Information, the prior offenses.
THE DEFENDANT: Yes, sir.
THE COURT: Is that what you wish to do?
THE DEFENDANT: Yes, sir.
THE COURT: And you have consulted counsel about this; is that correct?
THE DEFENDANT: Yes, sir.
THE COURT: Free and voluntary on your part?
THE DEFENDANT: Yes, sir.
THE COURT: All right. The Court will find that you have freely and voluntarily stipulated and agreed and admitted the prior convictions and have affirmatively stated you did not want to testify.

*State,* 1974 OK CR 52, ¶ 6, 520 P.2d 699, 700. We find the same principle applicable here, though the defendant did not personally testify before the jury. By his own statements and those of his counsel, admitting the fact of his prior convictions, Appellant clearly waived the statutory protections of the two-stage procedure. Considering the overwhelming evidence, we find no possibility that the Appellant's conviction of first degree murder resulted from the "prejudicial misuse of his former convictions by the jury during their determination of guilt." *Chapple,* 1993 OK CR 38, ¶ 18, 866 P.2d at 1217. Because Appellant has not shown that the failure to bifurcate his trial goes to "the foundation of the case" or takes any "right essential to his defense," there was no plain error. *Simpson,* 1994 OK CR 40, ¶ 12, 876 P.2d at 695. Proposition Three is denied.

■ ¶ 49 In Proposition Four, Appellant challenges the sufficiency of the evidence to convict him of grand larceny. He also argues that under section 11(A) of Title 21, Oklahoma Statutes, because the item he took was a motor vehicle, the State should have charged him under the more specific statute for larceny of a motor vehicle. The relevant elements of grand larceny are: (1) taking; (2) and carrying away; (3) personal property of another; (4) valued at more than $500 dollars or from the person of another; (5) by fraud or stealth; (6) with the intent to deprive permanently. Instruction No. 5–93, OUJI–CR(2d); 21 O.S.2001, § 1701. The elements of the crime of larceny of a motor vehicle are: (1) trespassory; (2) taking; (3) and carrying away; (4) the automobile, aircraft, vehicle, construction or farm equipment vehicle; (5) of another; (6) with the intent to steal. Instruction No. 5–100, OUJI–CR(2d); 21 O.S.2001, § 1720.

¶ 50 In *Jackson v. State,* 22 Okl.Cr. 338, 353, 211 P. 1066, 1072 (1923), this Court held that by the Legislature's enactment, in 1919,[15] of the statute defining the crime of larceny of a motor vehicle, "[a]utomobiles and automotive driven vehicles were ...

withdrawn from the operation of the general grand larceny statute." *See also, Riley v. State,* 64 Okl.Cr. 183, 187, 78 P.2d 712, 715 (1938). The State agrees that Appellant should have been charged with larceny of a motor vehicle under section 1720 rather than the grand larceny statute, and that his conviction should be modified to larceny of a motor vehicle. We agree with Appellant's claim that the charge of grand larceny was improper where another statute clearly applied to this theft of a motor vehicle.

■ ¶ 51 Appellant also argues, however, that the evidence shows he is guilty of no more than the lesser-included offense of unauthorized use of a motor vehicle, in violation of 47 O.S.2001, § 4–102. The elements of unauthorized use of a motor vehicle are: (1) taking, using, or driving; (2) a vehicle; (3) by the defendant; (4) without the consent of the owner; (5) with the intent to deprive the owner, temporarily or otherwise, of the vehicle or its possession. This crime "differs from Larceny of an Automobile only in that it requires the perpetrator intended to temporarily deprive the owner of possession of his vehicle as opposed to permanently depriving the owner of possession of his vehicle," and carries a lesser minimum punishment. *Fox v. State,* 1984 OK CR 83, ¶ 2, 686 P.2d 292, 293; 47 O.S.2001, § 17–102.

¶ 52 We review this sufficiency challenge to determine whether the evidence, in the light most favorable to the State, would permit any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt. *Spuehler v. State,* 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203. Appellant admits the taking of the four-wheeler, but argues that the evidence shows no intent to permanently deprive the owners of its possession, pointing to the fact that he used the vehicle solely to escape from the murder scene, then abandoned it by the side of the road.

¶ 53 We first note the statement in the Committee Comments to Instruction 5–100, OUJI–CR(2d), that the "intent to steal" ele-

---

15. Laws 1919, c. 102, p. 155, § 1, provided: "Any person in this state who shall steal an automobile or other automotive driven vehicle shall be guilty of a felony, and upon conviction shall be punished by confinement in the state penitentiary for a term of not less than five (5) years, nor more than twenty (20) years."

ment of larceny of a motor vehicle "encompasses two concepts: intent to deprive the owner permanently; and intent to convert to the taker's own use." Contrary to Appellant's reasoning, our cases also show that what Appellant calls his "intent to use the vehicle temporarily" is not the same thing in law as the intent to deprive *the owner* of its use *temporarily.* The Supreme Court of Oklahoma Territory reversed a conviction on similar grounds in *Mitchell v. Territory,* 7 Okla. 527, 54 P. 782 (1898). Defendants lived with their family on an acreage that was the subject of a boundary dispute with a neighbor. When the neighbor began plowing a field inside the disputed property line, defendants took his mule team to prevent him from plowing. The mules were secreted on a nearby property, and defendants testified that they planned to release the mules in their owner's pasture when tempers cooled. The supreme court found that evidence of the defendants' contemporaneous statements to officers at the time of their arrest, stating these essential facts, were improperly excluded from evidence at trial. The supreme court held;

> Any taking of personal property with the intent to temporarily deprive the owner thereof, *and then return the same,* does not constitute larceny, but is a trespass. In order to constitute a felonious intent, the taking must be to permanently deprive the owner of the property ... [Defendants] admitted the wrongful taking of the property, but claimed it was taken with no intention to deprive the owner permanently of his property, but only temporarily; that they intended to keep it a short time, *and return it to him. This was a proper and legitimate defense to the charge of larceny, and one that they had a right to have the jury pass upon.*

*Mitchell,* 7 Okla. at 533–34, 54 P. at 784 (emphasis added).

¶ 54 In *Barnes v. State,* 1963 OK CR 102, 387 P.2d 146, this Court affirmed a conviction of larceny of an automobile. The car in question was for sale at a dealership. The defendant negotiated terms for a sale of the vehicle and an agreed down payment, but told the dealer he would have to get the money at his mother's house, fifteen miles away. The defendant then drove the car away from the dealership without the owner's knowledge or permission. At trial, the defendant claimed he had taken the car temporarily and without a felonious intent, and was on his way to his mother's house to get the money for a down payment. *Id.,* 1963 OK CR 102, ¶¶ 1–4, 387 P.2d at 147. This Court found the evidence was sufficient to support a conviction, but approved the following instruction as a correct statement of the law:

> You are instructed that for the State to sustain the charge against the defendant of larceny of an automobile, it is necessary for the State to prove specifically that the automobile was taken by the accused with felonious intent to deprive the owner thereof permanently and to convert the automobile to accused's own use. Any taking of personalty *with intent to deprive the owner thereof temporarily and then to return the personalty* does not constitute larceny, but is a trespass, since the taking must be to deprive the owner permanently of the property to constitute a felonious intent.

*Barnes,* 1963 OK CR 102, ¶ 11, 387 P.2d at 148 (emphasis added).

¶ 55 In *Hughes v. State,* 61 Okl.Cr. 40, 44–45, 65 P.2d 544, 546 (1937), quoting *Huffman v. State,* 24 Okl.Cr. 292, 217 P. 1070, 1073 (1923), the Court again acknowledged that "property may be taken *with an intent to return it,* or be taken by mistake, or some intent other than to deprive the owner thereof, in which case larceny has not, of course, been committed" (emphasis added). While a defendants' intent to *return the property* to its rightful owner after a wrongful taking potentially negates the *mens rea* of larceny, mere abandonment of property at some point after its theft does not. *Traxler v. State,* 96 Okl.Cr. 231, 251 P.2d 815 (1953) well illustrates the reasons why this is not the law. In *Traxler,* while defendant was being pursued by officers, he took a car (and its owner, as a hostage) at the point of a gun. Convicted of robbery with a dangerous weapon, he claimed on appeal that the instructions failed to state the required element of *animus*

*furandi*, or the intent to permanently deprive the owner of the property.

¶ 56 Like the Appellant here, he argued that "his intention at the time of taking was only to use the car to escape the officers." *Id.*, 96 Okl.Cr. at 251, 251 P.2d at 835–36. This Court found the robbery statutes, 21 O.S., §§ 797–801, did not incorporate a *mens rea* element of *animus furandi*, and instructions in the language of the robbery statute were sufficient. *Traxler*, 96 Okl.Cr. at 252, 251 P.2d at 837. In a passage with pertinence to the current discussion, the Court said:

> If he could use the car temporarily and be entitled to have the jury consider such question and find him not guilty if the taking was only for a temporary deprivation, how many hours or days could he use the car, and how far could he drive it? One mile, one hundred, or ten thousand or more? ... Such theory of temporarily taking by the most causal analysis is to show how far from any point it can be reduced *ad absurdum*.

> An accord with the principle contended for would tend to weaken and destroy law and order and make all citizens liable to death, humiliation or at least a loss in the value of their property at the whim of the irresponsible and dangerous and facilitate the escape of gangsters, murderers or any other criminal, and could be expected to lead to disrespect for law and force the citizen for protection to resort to drastic personal action.

> \* \* \*

> But the fact that such question is submitted to the jury in many instances in the past has permitted the escape of persons taking at gun point and practically rendering valueless, personal property, and then by reason of the right to have the question decided by the jury, and by the services of an adroit and brilliant criminal lawyer, making the efforts of the law enforcement officers seem ludicrous. The history of the practice in each state and in each decade is full of illustrations.

*Id.*, 96 Okl.Cr. at 251, 251 P.2d at 836–37, and n. 11.

¶ 57 Appellant's argument here would have this Court "strain at a gnat, and swallow a camel." [16] This entire episode was born of Appellant's intent to permanently deprive others of the quiet possession of their property, and indeed, their very lives. The jury found beyond a reasonable doubt that Appellant possessed the intent to permanently deprive the owners of property in connection with the charge of grand larceny. That finding is supported by sufficient direct and circumstantial evidence. The evidence is likewise sufficient to support a finding that Appellant is guilty of larceny of a motor vehicle. We will therefore modify the conviction in Count 3 to larceny of a motor vehicle, after two (2) or more prior felony convictions, and sentence Appellant to a term of twenty-five (25) years imprisonment.

 ¶ 58 Proposition Five argues that the trial court's admission of photographs of the crime scene was reversible error. Appellant specifically objects to exhibits depicting vomit on the jeans of Amber Matthews, the bloody shirt worn by baby Gracie Kopf at the time of the shootings, and a pool of blood in the floor of the bedroom where Appellant murdered Amber Matthews. The admission of photographs is within the trial court's discretion and will not be disturbed absent abuse of discretion. *Browning v. State*, 2006 OK CR 8, ¶ 32, 134 P.3d 816, 837. Trial counsel objected to the vomit stained jeans as irrelevant, the bloody baby clothing as "repetitive," and failed to object to the exhibit depicting a close-up view of the pool of Ms. Matthews' blood.

 ¶ 59 Photographic exhibits may be probative of the nature and location of wounds, may corroborate the testimony of witnesses, including the medical examiner, and may show the nature of the crime scene. *Browning*, 2006 OK CR 8, ¶ 32, 134 P.3d at 837. Gruesome crimes make for gruesome crime scene photographs, but the real issue is whether the probative value of relevant evidence is substantially outweighed by the danger of unfair prejudice, confusion of the

**16.** Matt. 23:24(KJV); *see also Arnold v. State*, 48 Okl.Cr. 452, 470, 132 P. 1123, 1129 (1913).

issues, or needless presentation of cumulative evidence. 12 O.S.2001, §§ 2401–2403; *Pavatt v. State*, 2007 OK CR 19, ¶ 55, 159 P.3d 272, 290.

¶ 60 The photograph of Amber Matthews' jeans corroborated testimony about her condition when she was found by police officers and emergency medical personnel. Considered in light of other evidence against the Appellant, the probative value of this evidence was not substantially outweighed by the risk of unfair prejudice or other factors identified in section 2403 of the Evidence Code. The bloody baby clothing established the infant's proximity to Amber Matthews at the time of the shooting. While the evidence is disturbing, it is probative of Appellant's premeditated intent to kill Ms. Matthews without the slightest regard for the defenseless child she held in her arms. We review Appellant's objection to the exhibit depicting a pool of blood and brain material for plain error only. Again, this photograph corroborates the testimony of witnesses concerning the nature of the wounds to Ms. Matthews and the issue of Appellant's intent. There is no plain error. Proposition Five requires no relief.

¶ 61 In Proposition Six, Appellant argues that the evidence is insufficient to support the jury's finding of the aggravating circumstance that there exists a probability that defendant will commit criminal acts of violence that will constitute a continuing threat to society. We review this challenge to determine whether the evidence, in the light most favorable to the prosecution, would permit a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. *Jones v. State*, 2006 OK CR 10, ¶ 4, 132 P.3d 1, 2; *see also Lewis v. Jeffers*, 497 U.S. 764, 781–83, 110 S.Ct. 3092, 3102–04, 111 L.Ed.2d 606 (1990). In *Gilson v. State*, 2000 OK CR 14, ¶ 157, 8 P.3d 883, 925, this Court held:

> To support the aggravator of continuing threat, the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future. In evaluating whether there is a probability that the defendant will com-

mit acts of violence which will constitute a continuing threat to society, we have held that evidence of the callousness of the murder for which the defendant was convicted can be considered as supporting evidence, as well as prior criminal history and the facts of the murder for which the defendant was convicted. (internal quotations omitted).

¶ 62 We find sufficient direct and circumstantial evidence to support the jury's finding of the "continuing threat" aggravating circumstance beyond a reasonable doubt. In addition to the facts of the crime itself, which show a callous and pitiless slaying, the State presented evidence of Appellant's prior burglaries, which progressed from auto burglaries to residential break-ins. Appellant told an investigator after his arrest for a residential burglary in Texas that he would have done "whatever it took" if he had been confronted by an occupant of the residence he was burglarizing. This revealed the formation of Appellant's criminal attitude and his willingness to use violence to achieve his objectives. The State also presented evidence that Appellant violently assaulted and threatened his then-wife with a loaded firearm during a domestic dispute. The jury was able to place these facts within the context of other evidence of Appellant's life history, his alcoholism, his unstable home life, unemployment, and depression. We find the evidence of Appellant's prior criminal history was properly admitted for the jury's consideration in connection with this aggravating circumstance, and the jury's finding is supported by sufficient evidence. This proposition is denied.

¶ 63 In Proposition Seven, Appellant claims the uniform jury instruction defining mitigating circumstances, Instruction No. 4–78, OUJI–CR(2d), unconstitutionally limited the jury's ability to fully consider mitigating circumstances in violation of the Eighth and Fourteenth Amendments and the Oklahoma Constitution. We addressed similar concerns in *Harris v. State*, 2007 OK CR 28, 164 P.3d 1103, and concluded that the definition in the current uniform instruction does not prohibit jurors from properly considering mitigating evidence. *Id.*, 2007 OK CR 28,

¶ 25, 164 P.3d at 1113. We see no reason to depart from this settled law. The Court did order the instruction modified in the Harris opinion, noting "the consistent misuse of the language in this instruction in the State's closing arguments." *Id.*, 2007 OK CR 28, ¶ 26, 164 P.3d at 1114. Appellant points to this modification of the language as further support for his argument. However, the Court specified in Harris that the language of the current instruction "is not legally inaccurate, inadequate, or unconstitutional," and that cases in which the instruction is used "are not subject to reversal on this basis." *Id.* Appellant has not shown that this instruction unconstitutionally limited the jury's consideration of mitigating circumstances. Proposition Seven requires no relief.

 ¶ 64 In Proposition Eight, Appellant argues that the trial court's failure to give the uniform instruction on victim impact evidence denied him a fair trial and a jury determination of his guilt of the aggravating circumstances in violation of the Eighth and Fourteenth Amendments. He correctly points out that the trial courts should give the uniform instruction in capital cases where victim impact evidence is introduced. *Cargle v. State*, 1995 OK CR 77, ¶ 77, 909 P.2d 806, 828–29; Instruction No. 9–45, OUJI–CR (2d). Trial counsel failed to object to the jury instructions on this ground or request different instructions at trial, and thus waived all but plain error. *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695.

 ¶ 65 Under the mandate set forth in *Cargle*, the trial court's failure to administer the uniform instruction on victim impact evidence was error. We have previously held that while the uniform instruction on victim impact evidence should be given when such evidence is introduced at trial, "the failure to give the instruction is not automatically fatal." *Powell v. State*, 2000 OK CR 5, ¶ 121, 995 P.2d 510, 535. In *Wood v. State*, 1998 OK CR 19, 959 P.2d 1, a case tried before the *Cargle* decision, the Court concluded that the failure to give a limiting instruction on victim impact evidence did not warrant remand for resentencing. The Court in Wood noted that no such instruction was given in *Cargle* itself, yet the Court had found the absence of such instruction did not require reversal. *Wood*, 1998 OK CR 19, ¶ 48, 959 P.2d at 13. The Court in *Wood* said;

> Considering the second stage instructions as a whole, we do not find the admission of the victim impact evidence altered or negated said instructions. Appellant has failed to demonstrate that the jury's sentencing discretion was not properly channeled by the instructions given to them or that the victim impact evidence influenced the jury to impose a sentence not supported by the evidence.

The Court has reached the same conclusion in several other cases. *Conover v. State*, 1997 OK CR 6, ¶¶ 75–76, 933 P.2d 904, 922; *Charm v. State*, 1996 OK CR 40, ¶ 38, 924 P.2d 754, 766.

¶ 66 While undoubtedly powerful, the victim impact evidence in this case was brief and carefully circumscribed. Indeed, Appellant raises no claim of error on appeal with respect to the presentation of the victim impact testimony itself. These facts distinguish the present case from those in which the Court has found the failure to give a limiting instruction required reversal. Those cases involved victim impact evidence that was either "borderline" or violated the limitations established in *Cargle*. *Malone v. State*, 2007 OK CR 34, ¶¶ 62–64, 168 P.3d 185, 211–12 (holding lack of *Cargle* instruction was plain error requiring reversal where testimony was "well beyond" appropriate victim impact evidence, including a "highly prejudicial sentencing recommendation"); *Miller v. State*, 2001 OK CR 17, ¶¶ 36–39, 29 P.3d 1077, 1085 (finding lack of Cargle instruction made it impossible to find errors in admission of prejudicial victim impact testimony were harmless). Considering the instructions as a whole in light of the victim impact testimony given at trial, we find the error here did not go to the foundation of the case or take from Appellant a right essential to his defense. *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695. The error creates no grave doubt that it had any substantial influence on the outcome at trial, and is therefore harmless. *Simpson*, 1994 OK CR 40, ¶¶ 36–37, 876 P.2d at 702. Proposition Eight is denied.

¶ 67 Appellant argues in Proposition Nine that prosecutorial misconduct in the sentencing phase closing arguments renders his death sentence unreliable and unfair. We have long allowed counsel for the parties "a wide range of discussion and illustration" in closing argument. *Hamilton v. State*, 79 Okl.Cr. 124, 135, 152 P.2d 291, 296 (1944). Counsel enjoy a "right to discuss fully from their standpoint the evidence and the inferences and deductions arising from it." *Frederick v. State*, 2001 OK CR 34, ¶ 150, 37 P.3d 908, 946, citing *Brown v. State*, 52 Okl.Cr. 307, 4 P.2d 129, 130 (1931) (Syllabus). We will reverse the judgment or modify the sentence "only where grossly improper and unwarranted argument affects a defendant's rights." *Ball v. State*, 2007 OK CR 42, ¶ 57, 173 P.3d 81, 95, citing *Howell v. State*, 2006 OK CR 28, ¶ 11, 138 P.3d 549, 556.

¶ 68 We review the challenged comments here only for plain error, due to the lack of any timely objection to the comments at trial. *Simpson*, 1994 OK CR 40, ¶ 12, 876 P.2d at 695. In the first comment, the prosecutor in closing argument rhetorically asked jurors:

> Will you choose to go down the path that the defendant wants you to go down? Or will you choose the other path and give him justice?

Appellant seems to construe this argument as an improper expression of the prosecutor's personal opinion. We disagree. This Court has held similar comments were not plain error where they were "not phrased in personal terms, but appealed to the jury's understanding of justice and asked that standard be upheld." *Lockett v. State*, 2002 OK CR 30, ¶ 21, 53 P.3d 418, 425, citing *Mitchell v. State*, 1994 OK CR 70, ¶ 44, 884 P.2d 1186, 1202, and *Hammon v. State*, 2000 OK CR 7, ¶ 62, 999 P.2d 1082, 1097. We found in *Lockett* that "the prosecutor basically argued to the jury that justice required the death penalty be imposed under the particular facts of this case, not based upon his personal opinion." *Lockett*, 2002 OK CR 30, ¶ 21, 53 P.3d at 425. We reach the same conclusion here. The argument was not plain error.

¶ 69 Appellant argues the prosecutor denigrated his mitigation evidence when he told jurors a story from childhood in which his mother would tell him "your actions have spoken so loudly I cannot hear a word your saying." He then applied this homespun saying to Appellant's mitigating evidence:

> The defendant's actions have spoken so loudly and so decisively that nothing he says can be heard. Alcohol problems, relationship problems, speech problems, none of these things even comes close to outweighing what he did. Doesn't outweigh the fact that he shot one person, that he murdered another, and he could have killed two babies. It doesn't outweigh the fact that he murdered Amber while he was out on parole and she was laying helplessly at his feet. It doesn't outweigh the fact that he is a continuing threat to society. In fact it doesn't even come close.

Appellant argues that these statements and others like them "attempted to destroy Mr. Grissom's right to have the jury consider relevant mitigating evidence" in violation of the protections of the Eighth Amendment as expressed in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

¶ 70 In *Warner v. State*, 2006 OK CR 40, 144 P.3d 838, the prosecutor in a capital sentencing trial argued that no mitigation evidence could reduce Appellant's culpability for

> raping and beating to death a baby [and] ... if you add up the mitigation ... and you multiplied it times ten ... would it outweigh the heinous, atrocious, cruel way that this defendant treated [the victim] the last 20 minutes, 30 minutes of her life?

*Id.*, 2006 OK CR 40, ¶ 191, 144 P.3d at 890. This Court held in *Warner* that the challenged comments were not plain error, reasoning that prosecutors have "the right to discuss evidence during the second stage in arguing for an appropriate punishment ... [and] may properly attempt to minimize the effect of the evidence presented by the defense." *Id.*, 2006 OK CR 40, ¶ 192, 144 P.3d at 890–91. Like the jury in *Warner*, the jury in this case was "appropriately instructed as to the mitigating evidence and was not in any way precluded from considering any and all

mitigating evidence" by the prosecutor's argument. *Id.* We find no plain error.

¶ 71 Appellant next alleges that the prosecutor's closing arguments improperly elicited sympathy for the victims of his crimes. Reviewing the comments identified in Appellant's brief, we find the comments are based on the evidence properly admitted at trial and exhorted the jurors to consider particular facts in determining punishment. This is not improper argument. In his final closing argument the prosecutor said:

> I wonder how it must feel to go to Amber's grave site on her birthday. I wonder how that feels. Knowing she is never coming back. And for why? What reason? No reason at all. How must that feel? That's a celebration of life that [her father] doesn't get to engage in. That's a celebration of life he doesn't get.

We find this comment was in response to defense counsel's argument that jurors could celebrate the sanctity of human life by showing mercy to the defendant with a non-capital sentence. As the argument was a proper response to the defense, there is no plain error. *Andrew v. State*, 2007 OK CR 23, ¶ 135, 164 P.3d 176, 203.

¶ 72 Appellant finally argues that the prosecutor improperly aligned himself with the jury in closing argument. The prosecutor's comment told jurors that after the defendant's crime, "another mission began" to bring the killers to justice. The police had carried the "torch of truth" as they sought to apprehend the perpetrators. They passed the torch on to the prosecutors, who "stood arm in arm with the Matthews family and continued that march toward justice." The prosecutor explained that after his argument "we are handing you that torch of truth, hoping and trusting that you will carry it across the line where justice awaits. Justice in this case is a death sentence."

¶ 73 This Court said in *Sanchez v. State*, 2009 OK CR 31, ¶ 75, 223 P.3d 980, 1005, that it "will not require counsel in such serious cases to address the jury with lifeless and timid recitations void of moral reflection or persuasive power." The comments challenged here form only a small part of a lengthy summation in which the State and defense counsel passionately argued conflicting views about the meaning of justice in this case. The jurors were well aware that the statements of counsel were not evidence and were intended to persuade the jury during its deliberations. Under these circumstances we cannot say that the challenged comments here were plain error. Even if individual comments in the State's closing argument were erroneous, we have no grave doubt that erroneous comments had a substantial influence on the outcome at trial. *Simpson*, 1994 OK CR 40, ¶ 37, 876 P.2d at 702. Proposition Nine requires no relief.

¶ 74 In Propositions Ten and Eleven, Appellant claims the deficient performance of his trial attorneys violated his right to the assistance of counsel under the Sixth and Fourteenth Amendments and Article II, section 20 of the Oklahoma Constitution. Appellant argues that counsel was ineffective in failing to request proper instructions, failing to object to inadmissible evidence and improper arguments, and in failing to discover and utilize additional mitigating evidence of Appellant's alleged dementia or brain damage resulting from alcoholism and head injuries. In connection with this latter claim, he has filed a motion to supplement the appellate record and request for evidentiary hearing as permitted by Rule 3.11(B), *Rules of the Oklahoma Court of Criminal Appeals*, 22 O.S.Supp.2010, Ch. 18, App.

¶ 75 We address these complaints applying the familiar test required by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). This Court strongly presumes that counsel rendered reasonable professional assistance. Appellant must establish the contrary by showing: (1) that trial counsel's performance was deficient; and (2) that he was prejudiced by the deficient performance. *Spears v. State*, 1995 OK CR 36, ¶ 54, 900 P.2d 431, 445. To determine whether counsel's performance was deficient, we ask whether the challenged act or omission was objectively reasonable under prevailing professional norms. In this inquiry, Appellant must show that counsel committed errors so serious that he was not

functioning as the counsel guaranteed by the Constitution. *Browning*, 2006 OK CR 8, ¶ 14, 134 P.3d at 830. The right to effective counsel is a means of enforcing the Constitution's guarantee of a fair and impartial trial, meaning a trial with a reliable result. The overriding concern in judging counsel's trial performance is "whether counsel fulfilled the function of making the adversarial testing process work." *Hooks v. State*, 2001 OK CR 1, ¶ 54, 19 P.3d 294, 317.

¶ 76 Where the Appellant shows that counsel's representation was objectively unreasonable under prevailing professional norms, he must further show that he suffered prejudice as a result of counsel's errors. The Supreme Court in *Strickland* defined prejudice as a reasonable probability that, but for counsel's unprofessional errors, the outcome of the trial or sentencing would have been different. *Hooks, id.,* citing *Williams v. Taylor*, 529 U.S. 420, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000). We will reverse the judgment and sentence only where the record demonstrates counsel made unprofessional errors "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. If the record before us permits resolution of a claim of ineffectiveness on the ground that *Strickland*'s prejudice prong has not been satisfied, we will ordinarily follow this course. *Phillips*, 1999 OK CR 38, ¶ 103, 989 P.2d 1017, 1043.

¶ 77 With regard to counsel's failure to object to allegedly inadmissible evidence and improper jury instructions, and to request different instructions at trial, our conclusions that the evidence was properly admitted at trial, and that erroneous jury instructions did not result in prejudicial error, foreclose any claim of ineffectiveness based on these omissions. Appellant simply cannot show a reasonable probability that, but for counsel's allegedly unprofessional errors, the outcome of the trial would have been different. Proposition Ten is therefore denied.

¶ 78 In Proposition Eleven, counsel argues that the failure to utilize mitigating evidence of his neurological deficits violated his right to effective counsel. In his accompanying request for evidentiary hearing as permitted by Rule 3.11(B), Appellant presents the affidavit and report of a neuropsychologist who evaluated Appellant for this appeal. In the report of her evaluation, the neuropsychologist concludes that Appellant meets the diagnostic criteria for dementia due to multiple etiologies, specifically possible deprivation of oxygen during his birth, a history of head injuries, and chronic abuse of alcohol. The neuropsychologist concludes that Appellant:

has overall low average intellectual abilities ... with moderately severe memory dysfunction and significant impairment in planning and organization abilities. His relatively intact verbal comprehension and vocabulary skills give him the appearance that he is higher functioning than is the case, cognitively. His overall pattern of cognitive dysfunction appears consistent with multiple brain insults, possibly beginning with the reported lack of oxygen at birth, but particularly relevant are the repeated significant head injuries in adulthood in combination with chronic, severe, and heavy alcohol consumption and suggests primary involvement of temporal lobes, bilaterally, with implication of the frontal systems as well.

... Mr. Grissom's cognitive difficulties meet the Diagnostic and Statistical Manual for Mental Disorders—Fourth Edition, Text Revision criteria for Dementia Due to Multiple Etiologies ...

Mr. Grissom presently suffers from significant cognitive dysfunction involving memory and planning, reasoning and organization abilities ... Mr. Grissom's cognitive impairment resulted from permanent organic brain effects of his repeated head injuries in combination with his severe alcoholism ... [A]t the time of the instant offenses Mr. Grissom's significant memory impairment and his difficulties in planning, reasoning, and organization abilities were made worse by his ingestion of a large amount of alcohol and likely impaired his ability to function in a cognitively efficient manner.

¶ 79 The record also reflects that Appellant retained a forensic psychologist and a

forensic psychiatrist to testify in his defense at trial. These expert witnesses evaluated Appellant and gave extensive testimony of their findings, including Appellant's reported history of a difficult birth, academic and social problems at an early age; a history of head trauma; his criminal history and imprisonment; abuse of alcohol; depression; and his troubled marriage. Neither of Appellant's expert witnesses at trial expressly diagnosed Appellant as suffering from dementia at the time of these offenses.

¶ 80 Under Rule 3.11(B)(3)(b)(i), this Court reviews the affidavits and evidentiary materials submitted by Appellant to determine whether they contain "sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." If the Court determines from the application that a strong possibility of ineffectiveness is shown, we will "remand the matter to the trial court for an evidentiary hearing, utilizing the adversarial process, and direct the trial court to make findings of fact and conclusions of law solely on the issues and evidence raised in the application." Rule 3.11(B)(3)(b)(ii). The evidentiary record thus created in the district court may then be admitted as part of the record on appeal and considered in connection with Appellant's claims of ineffective counsel. Rule 3.11(B)(3) and (C).

¶ 81 We have recently emphasized that our reading and application of Rule 3.11 is not inconsistent with *Strickland;* nor does it lade appellants with a heavier burden to demonstrate ineffectiveness on appeal than *Strickland* itself.

This standard is intended to be less demanding than the test imposed by *Strickland* and we believe that this intent is realized. Indeed, it is less of a burden to show, even by clear and convincing evidence, merely a *strong possibility* that counsel was ineffective than to show, by a preponderance of the evidence that counsel's performance actually was deficient and that but for the unprofessional errors, the result of the proceeding would have been different as is required by *Strickland.* Thus, when we review and grant a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we do not make the adjudication that defense counsel actually was ineffective. We merely find that Appellant has shown a strong possibility that counsel was ineffective and should be afforded further opportunity to present evidence in support of his claim. However, when we review and deny a request for an evidentiary hearing on a claim of ineffective assistance under the standard set forth in Rule 3.11, we necessarily make the adjudication that Appellant has not shown defense counsel to be ineffective under the more rigorous federal standard set forth in *Strickland.*

*Simpson v. State,* 2010 OK CR 6, ¶ 53, 230 P.3d 888, 906.

¶ 82 After considering Appellant's claim in light of the evidence offered at trial, the arguments in his brief, and his supplemental materials, the Court finds that Appellant has not shown clear and convincing evidence that suggests a strong possibility that trial counsel was ineffective in failing to develop and utilize the type of evidence presented here. The neuropsychological report largely reflects the mitigating narrative already presented at trial. Other aspects of the report are equivocal, at best: The mitigating force of Appellant's reported deficits in memory, planning, and organizational skills—as a result of his alleged dementia—is significantly diminished by other undisputed evidence of how he carried out these crimes. To borrow a phrase from his expert, if Appellant had been slightly more "cognitively efficient" in the execution of his plans, he certainly would have murdered Dreu Kopf, and might have avoided apprehension altogether, or at least long enough to endanger additional lives. The proffered evidence of Appellant's diagnosis with dementia and its accompanying deficits does not appreciably alter the balance of aggravating and mitigating circumstances considered by the jury at trial. We conclude that Appellant has not shown that counsel was ineffective for failing to utilize the type of evidence presented in his supplemental materials, and no evidentiary hearing is nec-

essary. Appellant's request for evidentiary hearing and Proposition Eleven are denied.

¶ 83 Proposition Twelve argues the accumulation of errors in this case warrants reversal or modification of the sentence. This Court found error in the district court's decision to give instructions on the defense of voluntary intoxication, and in the failure to give the uniform instruction on victim impact evidence. Appellant has not shown that these errors resulted in prejudice to him. The Court also found Appellant was erroneously charged with and convicted of grand larceny, and modified the conviction to larceny of a motor vehicle. We find no other errors and conclude the errors at trial had no cumulative effect that rendered the trial unfair or the outcome unreliable. Proposition Twelve requires no relief.

¶ 84 This Court must determine in every capital case: (1) whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and (2) whether the evidence supports the jury's finding of the aggravating circumstances. 21 O.S.2001, § 701.13(C). The jury found the aggravating circumstances that the defendant created a great risk of death to more than one person; that he committed murder while serving a sentence of imprisonment; and the existence of a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society. 21 O.S.2001, § 701.12(2), (5), and (7). Appellant presented substantial evidence of mitigating circumstances as detailed above. We have carefully reviewed the record and find that the jury was not improperly influenced by passion, prejudice, or any other arbitrary factor in the determination of guilt or sentence.

## DECISION

¶ 85 The Judgment and Sentence of the District Court of Blaine County in Counts 1, 2, and 4 are **AFFIRMED.** The Judgment and Sentence in Count 3 is **MODIFIED** to a conviction for larceny of a motor vehicle, after two (2) or more previous felony convictions, for which Appellant is sentenced to twenty five (25) years imprisonment. Pursuant to Rule 3.15, Rules of the Court of Crimi-

nal Appeals, Title 22, Ch. 18, App. (2010), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

A. JOHNSON, P.J., and C. JOHNSON, and SMITH, JJ.: Concurs.

LUMPKIN, J.: Specially Concurs.

LUMPKIN, Judge: Specially Concur.

¶ 1 I concur in the Court's decision to affirm the judgments and sentences in this case and the modification of Count 3. However, I write to point out a statutory distinction to the general rule addressed in Proposition II. In footnote 13, addressing the issue of whether there was sufficient evidence of voluntary intoxication which necessitated the giving of a lesser included instruction, the Court quotes *Wharton on Homicide* for the proposition that if sufficient evidence exists to meet the voluntary intoxication requirements then either "manslaughter or murder in the second degree" would be the proper lesser included instruction. While legal treatises are valuable in conveying the general legal principles and practices, it is necessary to go to specific statutes to determine if the legislature has followed the general principles or has deviated from them through the enactment of specific penal statutes.

¶ 2 Determining whether instructions on a lesser included offense should be given is a two step analysis. First, it must be determined whether the alleged lesser offense is a legally recognized lesser included offense of the charged offense. *Shrum v. State,* 1999 OK CR 41, ¶ 7, 991 P.2d 1032, 1035. This Court has traditionally looked to the statutory elements of the charged crime and any lesser degree of crime to determine the existence of any lesser included offenses. *Id.* This determination is not case-specific and can only be made by looking at the statutory elements. *Id.,* 1999 OK CR 41, ¶ 5, 991 P.2d at 1038 (Lumpkin, V.P.J., concurring in results). A lesser offense is a part of the greater offense when the establishment of the essential elements of the greater offense necessarily establishes all the elements required to prove the lesser included offense. 22 O.S.2001, § 916; *State v. Uriarite,* 1991 OK CR 80, ¶ 8, 815 P.2d 193, 195. *See also*

*Schmuck v. United States,* 489 U.S. 705, 716–717, 109 S.Ct. 1443, 1451, 103 L.Ed.2d 734 (1989).

¶ 3 The second step of the analysis looks to the evidence to determine whether *prima facie* evidence of the legally recognized lesser included offense has been presented at trial. *Bland v. State,* 2000 OK CR 11, ¶ 56, 4 P.3d 702, 719–20. *See also Ball v. State,* 2007 OK CR 42, ¶ 32, 173 P.3d 81, 90. *Prima facie* evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater. *Eizember v. State,* 2007 OK CR 29, ¶ 111, 164 P.3d 208, 236 *citing Hogan v. Gibson,* 197 F.3d 1297, 1305 (10th Cir.1999).

¶ 4 Historically, Second Degree Murder has been recognized as a lesser included offense of First Degree Murder.[1] *See Simpson v. State,* 2010 OK CR 6, ¶¶ 16–18, 230 P.3d 888, 897; *Ball,* 2007 OK CR 42, ¶ 37, 173 P.3d at 91; *Williams v. State,* 2001 OK CR 9, ¶¶ 22–23, 22 P.3d 702, 711–712; *Freeman v. State,* 1994 OK CR 37, ¶¶ 9–12, 876 P.2d 283, 286; *Dennis v. State,* 1977 OK CR 83, ¶ 24, 561 P.2d 88, 94–95; *Gibson v. State,* 1970 OK CR 171, ¶¶ 9–10, 476 P.2d 362, 364–365; *Jewell v. Territory,* 4 Okl. 53, 43 P. 1075, 1078–1082 (1896).

¶ 5 Next, looking at the evidence in this case, no rational jury would have acquitted Appellant of First Degree Murder in favor of a finding of guilt of Second Degree Murder. Therefore, the trial court did not abuse its discretion in failing to submit a jury instruction on Second Degree Murder as a lesser included offense of First Degree Murder.

1. *But see, contra Willingham v. State,* 1997 OK CR 62, ¶¶ 20–27, 947 P.2d 1074, 1080–1081 (second degree murder is not a lesser included offense of first degree murder) *overruled in part, Shrum,* 1999 OK CR 41, ¶ 10, 991 P.2d at 1036. Due to the confusion over the years and a desire
to give the trial bench and bar a bright line to apply in determining lesser included offenses as to Murder, First Degree, I concurred in *Willingham.* However I accede to the current interpretation to ensure the trial bench and bar have a unified method to analyze future cases.